FOURTH DIVISION

June 30, 2003

No. 1-99-3768

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

) No. 95 CR 14435

)

STEVEN BRAMLETT, ) Honorable

) Leo E. Holt,

Defendant-Appellant. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Steven Bramlett was charged with first degree murder for the shooting death of Tyree Jones.  Prior to trial, defendant filed a motion to quash arrest and suppress the statement he made to the police, which the trial court denied.  Thereafter, he was found guilty in a stipulated bench trial and was sentenced to 20 years' imprisonment.  Defendant now appeals from his conviction, arguing that there was no probable cause for his arrest and that his statement was involuntary and, therefore, inadmissible.  No questions are raised on the pleadings.  

We concur with the defendant that his motion to quash arrest should have been granted and, for the following reasons, vacate his conviction and sentence, and remand for further proceedings.

On April 19, 1995, at approximately 9:30 p.m., Tyree Jones was shot in the chest and was killed.  Two other women were also shot in this incident, but neither sustained a fatal injury.  Four African-American males, including the defendant, were suspects in the shooting.  At the time of the incident, defendant allegedly was a back seat passenger in the vehicle from which the fatal shots were fired.

Sometime between 2 and 2:45 a.m. on the morning of April 20th, three Chicago police officers – Officers Law, Richards and O'Connor – came to the defendant's home without an arrest or search warrant.  According to Officer Law, the three officers were acting pursuant to information provided by another officer in the gang tactical unit who stated that the defendant was wanted for questioning in connection with the Jones shooting.  However, Officer Law also testified that he did not know where his colleague obtained that information and could not attest to its reliability.  After arriving at the defendant's home, the three officers entered the apartment building through the front door, continued to his apartment, and then knocked on the door.  The officers met defendant's father, Thomas Bramlett, and told him that they wanted to speak with his son regarding a shooting that had taken place earlier that evening.  Mr. Bramlett told the officers that the defendant was sleeping, and that he would wake him.  The parties disagree as to what happened next.

In the suppression hearing, defendant testified that after his father woke him and he opened his door, "the police officers came right in and was [
sic
] talking, and put my clothes on."  The officers then arrested the defendant and put him in their car but did not have room for defendant's father to accompany them.  Allegedly, they also stated that they could not wait for Mr. Bramlett to get dressed and follow them to the 4th district station in his own car, so they gave defendant's father directions.   The police then took the defendant to the police station where, allegedly, he was handcuffed to a chair in the gang office.  

At approximately 3:15 a.m., Officer Brandenburg began to ask identification-related questions.  The defendant claimed that during that process, he told Officer Brandenburg that he was only 15 years' old and that he wanted to see his father.  Despite that request, Officer Brandenburg chose not to call the Bramlett's home phone number and did not "make a concerted effort to look for [defendant's] father at the station after he did not see him in the waiting area."  Furthermore, defendant noted, Officer Brandenburg had not been told by the arresting officers that the defendant's father might be arriving at the station.  At that point, defendant had made no statement regarding any involvement in the Jones shooting.

Defendant's father testified that while his son was being processed, he arrived at the 4th district police station, told the desk sergeant who he was, and asked to see his son.  Apparently, the desk sergeant told Mr. Bramlett that he could not see the defendant because he was being questioned, and that Mr. Bramlett should wait in the hall.  Mr. Bramlett waited for approximately 30 to 45 minutes in the hall until he saw the defendant being taken out of the station by two officers.  Again, Mr. Bramlett was not allowed to speak with the defendant, but was told he was being transferred to the 111th Street station.  Defendant claimed that he never knew that his father had been present at the 4th district police station.  Defendant was then taken in handcuffs to the 111th Street Station and was put into a small interview room with a steel bench, table, and chairs.

At the 111th Street Station, sometime before 5 a.m., a Detective Leracz allowed defendant's father to enter the interview room to speak with the defendant.  However, defendant claimed that was not permitted to speak with his father outside the presence of the police and that his father was let into the interview room for no more than 10 minutes.  In addition, both the defendant and his father asserted that Detective Leracz never read defendant his 
Miranda
 rights while they were in the interview room together and that when Mr. Bramlett asked the detective whether his son needed an attorney, he was told that a lawyer was not necessary because the defendant was only at the station for questioning.  After spending 10 minutes in the interview room, Mr. Bramlett was escorted out of the room but was not informed that the police would continue questioning the defendant.  Rather, defendant's father claimed that he thought the defendant would be returning home.

For the next eight hours, until approximately 1 p.m., the defendant asserted that he remained locked in the interview room and was questioned by a variety of different police officers.  He claimed that, during this time, the officers did not permit him to sleep continuously and allowed him only a bag of potato chips and two sodas.  Sometime between 1 and 1:30 p.m., Detective O'Boyle, assistant State's Attorney Alesia, and Youth Officer Brooks entered the room to question the defendant.  Defendant stated that while he was introduced to those men, he did not know the role of the youth officer or the assistant state's attorney.  Throughout the entire time those men were in the room, defendant stated that he never told them that he did not want his father present and that, in fact, he specifically asked for his father and mother numerous times.

At approximately 3 p.m., Detective O'Boyle, assistant State's Attorney Alesia and Youth Officer Brooks returned to the interview room to get a statement from the defendant while defendant's father remained in the hallway.  Allegedly, defendant requested that his statement be handwritten by the assistant state's attorney.  As such, after defendant gave his oral statement, the three men left the room to transcribe what he had said.  The defendant stated that when the men returned, he was only permitted to read the first page of the written statement.  In addition, when he was told to sign it in numerous places without being able to read what, in total, he was signing, he complied.  Essentially, he claimed that after more than 12 hours in police custody, he was so scared and tired that he did not pay close attention to the details of what he was signing.

Defendant's statement asserts that on April 19, 1995, he was with his friends Eric Gauthreaux, Kevin Winters, and "Scottie," and that Eric and Kevin were in Eric's car and talking about shooting a member of the Gangster Disciples street gang.  Eric then told the defendant that he could not get in the car unless he obtained a gun.  Accordingly, defendant stated that he began walking home and ran into Scottie.  At that point, Scottie and the defendant returned to Eric's car, and when Eric asked the defendant whether he had a gun, the defendant replied that he did. Defendant stated that after all four of them got into Eric's car, they drove until they encountered a group of Gangster Disciples.  After the group of Gangster Disciples began to flash gang signs "disrespecting" the Blackstone street gang, Kevin pointed a gun at the group and pulled the trigger.  Because the safety was on, however, the gun did not fire.  Then, Scottie shot his .38 caliber gun five times at the crowd, which was beginning to run away.  Kevin then yelled "GDK," which means Gangster Disciple Killer, and shot 1 to 6 times at the group.  Defendant claimed that he did not see any other guns or weapons in the hands of any person running away from them.  They then drove away, and once they got to 75th Street and Colfax Avenue, he got out of the car and went home.  Finally, defendant stated that he did not tell the police about what transpired that night until the police came to his house.

At the suppression hearing, defendant also claimed that he had been told conflicting things about his father – that he had gone home or that he would see him soon if he cooperated with the police.  In other words, he claimed that he believed he would be going home once he signed the written statement.  In fact, however, defendant's father was waiting outside from approximately 5 a.m. until 3 p.m. and was repeatedly told to wait and remain seated.  A little after 3 p.m., an officer came into the hallway where Mr. Bramlett was waiting and told him that there was a problem with the defendant and that he had signed some papers.  Defendant's father claimed that it was only at that moment that he realized the defendant was in serious trouble and would not be going home.  Immediately thereafter, defendant's father hired an attorney for the defendant.

The State's witnesses in the suppression hearing recalled the evening's events differently.  Officer Law testified that after he and Officers Richards and O'Connor arrived at the defendant's house, they waited for him at the front door.  Once the defendant arrived, Officer O'Connor read defendant's 
Miranda
 rights to him in front of defendant's father.  Officer Law also stated that after defendant responded that he understood each of his rights, the police put him in handcuffs and placed him in an unmarked police car.  Because there was no room for the defendant's father in the car, Mr. Bramlett had to follow the police car to the 4th district police station using directions given to him by the police.  Officer Law stated that while riding to the police station, no officer questioned the defendant at any time, none knew that the defendant was only 15 years' old, and none told the defendant that if he provided the information they were seeking that he would be able to return home.

The first officer to see the defendant at the police station, Officer Brandenburger, testified that he told the defendant that he was under arrest and advised him of his Miranda rights using a pre-printed card from a Fraternal Order of Police book.  Defendant indicated that he understood his rights after each was read to him.  Officer Brandenburger then asked the defendant, "[d]o you wish to answer the [
sic
] questions at this time?" and the defendant allegedly replied that he did.  Officer Brandenburger proceeded to ask questions regarding the defendant's vital statistics, whereupon he learned that the defendant was 15 years' old.  Officer Brandenburger stated that when he finished taking the defendant's basic information, he transferred the defendant to the 111th Street Station.  The entire time that the defendant was answering Officer Brandenburg's questions, he allegedly never asked to see a parent or attorney.

Upon defendant's arrival to the 111st Street Station, he was placed in an interview room and had his handcuffs removed.  Detective Leracz, the detective assigned to violent crimes that day, testified that the defendant's father arrived at approximately 4 a.m. and asked to see the defendant.  Accordingly, Detective Leracz brought the defendant's father to the interview room and let him speak with the defendant alone.  Detective Leracz then stated that at approximately 5 a.m., he went into the interview room and advised the defendant of his 
Miranda
 rights in the presence of his father.  After he explained each 
Miranda
 right, the defendant told Detective Leracz that he understood.  After defendant recognized the possibility that he could be charged as an adult, he waived his rights and agreed to speak with Detective Leracz.  However, Detective Leracz claimed that no part of the interview was conducted outside the presence of the defendant's father.

Eventually, the defendant admitted that he was in the car when the shooting was planned and when it occurred.  At some point after that admission, defendant's father asked Detective Leracz if he should get an attorney for the defendant.  Detective Leracz asserted that he told Mr. Bramlett that he could not give him any advice as to whether or not to obtain the services of an attorney.  Nevertheless, Detective Leracz claimed that he never told the father that he should 
not
 get an attorney for the defendant.  In any event, Detective Leracz claimed that neither the defendant or his father ever requested an attorney.

After speaking with Detective Leracz, the defendant spoke with Detective O'Boyle and assistant State's Attorney Alesia.  Detective O'Boyle testified that when he first spoke with the defendant, he knew that he was approximately 15 years' old.  Detective O'Boyle claimed that when he entered the interview room on April 20, 1995, the defendant was not handcuffed but the door to the room was locked.  After entering the room, assistant State's Attorney Alesia advised the defendant of his 
Miranda
 rights by memory and also told the defendant that he had the right to have his parents present.  Defendant responded that he understood each right as it was relayed to him and agreed to make a statement, but did not want his father present.

Further, Detective O'Boyle testified that at 3 p.m., defendant was told that he could memorialize his statement by either giving a statement to a court reporter or a handwritten statement, and the defendant chose a handwritten statement.  Defendant then described what happened while assistant State's Attorney Alesia wrote it down.  Once defendant's statement was completed, he read the statement along with assistant State's Attorney Alesia and made one correction on page 4.  After he finished, assistant State's Attorney Alesia, Detective O'Boyle, youth officer Brooks, and the defendant signed their names at the bottom.  Finally, Detective O'Boyle stated that no time while the defendant was giving his statement did he ask for an attorney or for his father and that he was given potato chips and two sodas when he was hungry.

On February 5, 1996 counsel for the defendant filed a motion to quash arrest and suppress the defendant's statement, making a two-fold argument: (1) the seizure of the defendant violated his fourth amendment rights because the police acted without a warrant and without probable cause; and (2) the interrogation of the defendant violated his fifth and sixth amendment rights and the due process clause because he was 15 years' old, no juvenile officer was present for most of his questioning, his parents were absent, and because he did not knowingly waive his rights against self-incrimination and right to counsel.    

Over two years later, on April 23, 1998, the trial court denied the defendant's motion to suppress his statement, finding that the police did have probable cause at the time of the defendant's arrest, and that the place of the defendant's arrest did not matter because of the existence of probable cause.  The court also thought that the evidence demonstrated that the defendant was given his 
Miranda
 warnings at the police station; that the police allowed the defendant's father to see the defendant and did not mislead the defendant as to his need for an attorney; and that the defendant was not too mentally and physically exhausted to make a voluntary statement.  Finally, the court found that the youth officer was present to protect the defendant's rights as a juvenile, and that "[t]he fact that the youth officer did not take an active part in the taking of the statement does not change the fact that the officer was there to protect the defendant's rights, was there to insure that the defendant's rights were not violated in any way."

After losing the motion to suppress, the defendant agreed to participate in a stipulated bench trial.  Before that could commence, however, the defendant was a victim of an armed robbery in which he was shot several times in the back, leaving him paralyzed from the waist down with a spinal cord injury.  As a result, the defendant was hospitalized and received rehabilitative care on an inpatient and outpatient basis.  Since his attack, the defendant has been confined to a wheelchair.  

Among other things at the stipulated bench trial, it was stipulated that if Dan Perry were to testify, his testimony would be the same as a handwritten statement he provided to Alesia and O'Boyle on April 20, 1995 and the same as it was in front of the grand jury.  In those statements, Perry stated that he is 13 years' old and that he, the defendant, Eric Gauthreaux, Kevin Winters, and "Scottie" are members of the Blackstone street gang.  At approximately 8:00 p.m. on April 19, 1995, Perry was with his girlfriend at 75th Street and Colfax Avenue when he saw a four-door brown Chevy Malibu driven by Eric pull up near him.  Kevin was in the front passenger seat and the defendant was in the rear passenger seat with Scottie next to him.  The car had "R.I.P. Mike" written in paint on the back, and Perry indicated that Mike was a Blackstone gang member who previously had been killed.

Perry stated that after Eric's car stopped, defendant got out and went to a blue car, retrieved a .38 caliber gun, and returned to Eric's car.  Then Eric, the defendant, Kevin, and Scottie talked about who was going to go retaliate.  Perry elaborated that they were intending to retaliate against the Gangster Disciples because they had shot at some other Blackstone members on April 19, 1995.  While they were talking, "Big Lord," a general in the Blackstone street gang, came out of a building on 79th Street, knocked on Eric's car, and said "let Steve [defendant] and Scottie go."  Perry stated that the defendant, Eric, Scottie, and Kevin then drove away in Eric's car.  

Perry stated that approximately one hour later, Eric pulled up in his car at the intersection of 76th Street and Kingston Avenue with "Fred," another Blackstone street gang member.  Perry asked Eric "what's up?" to which Eric replied, "we just lit them up."  This, Perry indicated, meant that they had just shot at some Gangster Disciples.  Eric then told Perry, "I'll tell you later," and then drove away.

It was also stipulated that O'Boyle and Alesia would identify the defendant in open court as well as the defendant's statement and his signature on each page.  After the stipulated bench trial, the court found the defendant guilty of first degree murder.  In so ruling, the court found that there was sufficient evidence to establish defendant's guilt by accountability.  In accordance with that finding, the court sentenced the defendant to 20 years' imprisonment.  Defendant filed a motion for a new trial, which was denied, and now appeals.

Defendant first argues that the trial court erred in finding that the police had the requisite probable cause to arrest the defendant in his home without a warrant.  Accordingly, defendant argues, because his arrest violated his fourth amendment right to be free from unlawful seizure, the trial court should have suppressed his statement as a product of that illegal arrest.  Initially, as defendant notes, it is undisputed in this case that the police came to his house, placed him in handcuffs and into a squad car, and took him into custody.  Certainly, because a reasonable person in the defendant's position would have felt that he was not free to leave police custody (
People v. Wallace
, 299 Ill. App. 3d 9, 16-18 (1998)), he, unquestionably, was arrested. 

Therefore, defendant claims, the legality of his arrest must turn on whether probable cause existed.  See 
People v. Lawson
, 298 Ill. App. 3d 997 (1998) (when the police arrest a suspect without obtaining a warrant, the State then has the burden of showing there was probable cause).  In addition, defendant notes, probable cause must be based on more than facts or rumors that trigger one's suspicions prompting them to question a suspect.  For example, in 
People v. Wilson
, 260 Ill. App. 3d 364 (1994), this court found that where an arrest was based only on an informant's tip whose reliability was unknown, "the police had no basis for arresting defendant beyond mere rumor or suspicion, sufficient bases for questioning him but not for arresting him."  
Wilson
, 260 Ill. App. 3d at 371.  Moreover, defendant notes, an inquiry of whether there was probable cause can only be based on those facts that the police knew prior to the arrest.  
Wilson
, 260 Ill. App. 3d at 372. 

Defendant asserts that the only information that the officers had prior to his arrest was based on a tip from an unnamed officer – whose reliability was unknown – that defendant was wanted for questioning in connection with the Jones shooting.  Like in 
Wilson
, defendant argues, such information is insufficient to demonstrate probable cause to arrest.  Defendant claims that at trial, however, defense counsel and the trial court mistakenly presumed that Perry's statement, which was acquired seven and one-half hours later, was available before the police arrested the defendant.  Such was evident, he claims, in the court's finding at the suppression hearing:

"[T]here was probable cause existing because of the statements made by other individuals indicating [defendant's] being in a vehicle, a specifically described vehicle with a specific name or slogan on it that indicated he was involved in the car with individuals, and he was in that car very shortly after a shooting involved with bullets fired out of that particular car.  So there was probable cause."

Nevertheless, defendant asserts, nothing in the record supports that presumption.

Therefore, our initial duty is to determine whether the trial court erred in finding that the police had the requisite probable cause.  See 
People v. Segovia
, 189 Ill. 2d 228, 244 (2000) ("[e]ven an arrest made during a warrantless non-consensual entry of a home does not vitiate a defendant's subsequent custody nor does it require suppression of a defendant's subsequent voluntary statement outside the home, so long as the authorities had probable cause to arrest the suspect.  
New York v. Harris
, 495 U.S. 14, 18-21, 109 L.Ed.2d 13, 21-22, 110 S.Ct. 1640, 1643-45 (1990); 
People v. Shelby
, 221 Ill. App. 3d 1028, 1041 (1991); 
People v. Long
, 208 Ill. App. 3d 627, 635 (1990).").  Recently, 
People v. De Luna
, 334 Ill. App. 3d 1 (2002) recited the standard of review:

"When a court's ruling on a motion to suppress involves factual determinations and assessments of credibility, we may not disturb the ultimate ruling unless it was manifestly erroneous.  See 
People v. Sorenson
, 196 Ill. 2d 425, 430-31 (2001) (this is because trial court is in best position to observe witnesses and weigh credibility); 
People v. Williams
, 181 Ill. 2d 297, 309 (1998) (generally, ruling on motion to suppress is subject to reversal only if manifest error); 
People v. Sweborg
, 293 Ill. App. 3d 298, 301 (1997) (when factual matters, from which more than one inference may be drawn, become issues in cause, trial court's determination merits deference and should not be disturbed absent manifest error)."  
DeLuna
, 334 Ill. App. 3d at 8-9.

However, the 
DeLuna
 court also discussed the review of suppression motions when the issues are not factual in nature:

"Recently, our courts declared that when a motion to suppress ultimately turns on questions of reasonable suspicion and probable cause, we must apply a de novo standard of review.  See 
Sorenson
, 196 Ill. 2d at 431 (adopting 
Ornelas v. United States
, 517 U.S. 690, 699, 134 L.Ed.2d 911, 920, 116 S.Ct. 1657, 1663 (1996), which held that 
de novo
 review is required for determinations of probable cause or reasonable suspicion involved in motion to suppress);  see also 
People v. DeSantis
, 319 Ill. App. 3d 795, 802(2001) (same); 
People v. Rush
, 319 Ill. App. 3d 34, 38 (2001) (these determinations require the different standard of review found in 
Ornelas
)."  
DeLuna
, 334 Ill. App. 3d at 9.

In the present case, both issues are present.  First, the defendant challenges the trial court's factual determination that, while the police officers who went to the defendant's home did not have specific knowledge of the defendant's involvement other than what another officer told him, other officers working in conjunction with the arresting officers had Perry's statement at that time which directly placed the defendant in the car during the commission of the crime.  Second, the defendant challenges that trial court's legal determination that any or all of that information could constitute probable cause.

In addressing the factual issue, we find that the dearth of evidence in the record makes the trial court's determination manifestly erroneous.  Detective O'Boyle testified at the suppression hearing that he became involved in the case from its origination, at approximately 9:30 p.m. on April 19, 1995, and that he spoke to various witnesses that evening and "into the morning hours" the next day.  At some point prior to 10 a.m. on April 20, 1995, he obtained Perry's statement implicating the defendant.  Additionally, officers Law, Richards and O'Connor testified that between 2 and 2:45 a.m. of April 20, 1995, they were investigating the crime when they knocked on the defendant's door and arrested him.  This constitutes the sum total of evidence put forward by the State to establish probable cause.

Defendant asserts that because Perry's statement was not memorialized until seven and one-half hours later, it is impossible that Officers Law, Richards and O'Connor could have known of its contents.  As the State points out, however, simply because Perry's statement was memorialized seven and one half hours after the defendant's arrest is not necessarily indicative of when Perry first spoke to the police.  In fact, the defendant's argument invites the fairly large presumption that the police take and immediately memorialize the statement of every witness to every crime when they receive it.  

The fact remains, however, that there is absolutely 
no
 
evidence
 in the record that indicates exactly when Detective O'Boyle procured Perry's statement during his approximate 12 hours of work on the case.  Consequently, there is no way the trial court could have ascertained whether Officer O'Boyle's knowledge existed contemporaneously with the other officers' arrest of the defendant.  Therefore, even in reviewing the evidence in the light most favorable to the State, we find the trial court's factual determination to be against the manifest weight of the evidence where it is unsubstantiated by any evidence in the record.  See 
Joel R. v. Board of Education of Mannheim School District 83
, 292 Ill. App. 3d 607, 613 (1997).

Thereafter, in determining the legal issue of whether probable cause existed for the defendant's warrantless arrest, we note that a court must find that the police had knowledge of facts which would lead a reasonable person to find that a crime has occurred and that it has been committed by the defendant.  
People v. Buss
, 187 Ill. 2d 144, 204 (1999).  And in making that determination, this court has found that "[w]hen officers are working in concert, probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest."  
People v. Bascom
, 286 Ill. App. 3d 124, 127 (1997).  However, in most cases where courts have imputed information from one officer to another for probable cause purposes, those courts have found evidence of some sort of communication between the officers, such as a dispatch of orders.  As the 
Bascom
 court noted,  "[c]ertainly, arresting officers may rely upon dispatches to make arrests even if they are unaware of specific facts that established probable cause to make the arrest.  [Citation.]   In such a case, however, the State must demonstrate that the officer who directed the dispatch to be issued possessed facts sufficient to establish probable cause to make the arrest.  [Citation.]"  
Bascom
, 286 Ill. App. 3d at 127-28.  See also 
People v. Crane
, 244 Ill. App. 3d 721, 724-25 (1993).

In the present case, the record reveals no evidence that Detective O'Boyle was working in concert with Officers Law, Richards and O'Connor prior to the defendant's arrest and interrogation.  First, Detective O'Boyle was assigned to the victim's case on the night of the murder; whereas Law, Richards, and O'Connor were on general patrol duty from 5:30 p.m. to 2 a.m. the following day.  While O'Boyle eventually obtained knowledge that the defendant may have been involved in the shooting, there is no evidence that he told anybody he was looking for defendant, that he directed anybody to arrest defendant, or that he was working with the officers who arrested defendant at the time of the arrest.  And as we previously found, there is no evidence that O'Boyle even had Perry's information at the time of the arrest. 

The State argues that it is highly probable that the arresting officers obtained their information from O'Boyle because the police did not arrest all the members of the Blackstone street gang and only went after the defendant, thus imputing O'Boyle's knowledge of Perry's confession to them.  However, even if we were to assume that O'Boyle was acting in concert and that he had procured Perry's confession at that point, Perry's confession cannot provide probable cause to arrest defendant where there is simply no factual evidence
 demonstrating that O'Boyle was the police officer who provided the others with the tip.  In short, not a single officer's testimony establishes any link between O'Boyle and Officers Law, Richards and O'Connor before and during the arrest.

Therefore, because there is no evidence to support the trial court's finding that Officer O'Boyle's knowledge of Perry's statement coincided with the other officers' arrest of the defendant, the contents of Perry's statement are irrelevant to whether Officers Law, Richards and O'Connor had probable cause.  Accordingly, we hold that the trial court erred in finding that probable cause existed for the defendant's arrest and that defendant, therefore, was illegally seized in violation of his constitutional rights

Such a determination, however, does not resolve the question of whether the defendant's later confession at the police station should have been admissible at the stipulated bench trial.  We recently noted:

"A confession obtained following an illegal arrest may, nonetheless, be admissible if the confession was sufficiently an act of the defendant's free will such that it is purged of the primary taint of the illegal arrest.  
People v. White
, 117 Ill. 2d 194, 222, 512 N.E.2d 677 (1987).  In 
Brown v. Illinois
, 422 U.S. 590, 603-04, 45 L.Ed.2d 416, 427, 95 S.Ct. 2254, 2261-62 (1975), the United States Supreme Court set forth four factors to be considered in determining whether a confession obtained following an illegal arrest was a product of that arrest or was purged of the initial taint.  These factors are:  1) the temporal proximity between the arrest and the confession;  2) the presence of intervening circumstances;  3) the purpose and flagrancy of the police misconduct;  and 4) whether 
Miranda
 warnings were given.  
Brown
, 422 U.S. at 603-04, 45 L.Ed.2d at 427, 95 S.Ct. at 2261-62.  The State bears the burden of demonstrating, by clear and convincing evidence, sufficient attenuation of evidence obtained through an illegal arrest.  
People v. Foskey
, 136 Ill. 2d 66, 86, 554 N.E.2d 192 (1990);  
People v. Wright
, 294 Ill. App. 3d 606, 612, 691 N.E.2d 94 (1998)."  
People v. Ollie
, 333 Ill. App. 3d 971, 984-85 (2002).

Like 
Ollie
, because the trial court concluded that the police had probable cause to arrest the defendant, it never considered the question of attenuation.  Also like 
Ollie
, the State argues that if we find that the defendant was illegally arrested, we should remand the matter to the trial court for it to conduct an attenuation hearing.  The defendant, however, claims that there are not enough attenuating circumstances to rid his confession of his illegal arrest and that, consequently, we should reverse his conviction, suppress his statement, and remand for a new trial.

We hold that, based on the insufficiency of the record, we cannot make an independent determination of the admissibility of the defendant's confession.  Therefore, we vacate the defendant's convictions and sentence and grant the State's request to remand the case to the trial court for a determination of whether the defendant's confession was sufficiently attenuated from his illegal arrest to make it admissible.  See 
People v. Wallace
, 299 Ill. App. 3d 9, 9 (1998); 
People v. Barlow
, 273 Ill. App. 3d 943, 950 (1995).  Since the trial court may conclude that the defendant's confession was not obtained by means of his illegal arrest and was properly admissible at trial, we will address defendant's other contention of error.

[The following material is non-publishable under Supreme Court Rule 23.]

[The preceding material is non-publishable under Supreme Court Rule 23.]

For the foregoing reasons, we vacate the defendant's conviction and sentence and remand the cause to the trial court with directions that it conduct an attenuation hearing.  If the trial court should find that the defendant's confession was sufficiently attenuated, we direct the court to reinstate the defendant's convictions and sentences.  If, however, the trial court finds defendant's confession to have been procured from his illegal arrest so as to make the confession inadmissible, we order the court to suppress the defendant's statements and conduct further proceedings consistent with this opinion.  We also comment that, while we affirm the trial court's determination that the defendant's confession was voluntary, for attenuation purposes, the voluntariness of a confession is not an issue.  See 
Barlow
, 273 Ill. App. 3d at 953, citing 
People v. Reynolds
, 257 Ill. App. 3d 792, 805 (1994). 

Judgment vacated and cause remanded with directions.

THEIS, P.J., and HARTMAN, J., concur.