FIRST DIVISION
March 20, 2006

No.1-04-1317

THE PEOPLE OF THE STATE OF ILLINOIS,      ) Appeal from the Circuit Court
                                               ) of Cook County

      Plaintiff-Appellee,                       )
                                               ) Nos.. 01 CR 696
             v.                             )       01 CR 707
                                             )

RALPH HOPKINS,                           ) Honorable
                                               ) Robert M. Smierciak,
      Defendant-Appellant.                   ) Judge Presiding.

**MODIFIED ON DENIAL OF REHEARING**   PRESIDING

JUSTICE CAHILL delivered the opinion of the court:

Defendant Ralph Hopkins was convicted of armed robbery (720 ILCS 5/18-2(a)(2) (West 2000)) and attempted armed robbery (720 ILCS 5/8-4(a), 18-2(a)(2) (West 2000)) after a jury trial. He was sentenced to two concurrent prison terms of 12 years each. On appeal, defendant claims his inculpatory statement should have been suppressed because the police had neither a reasonable suspicion to stop him nor probable cause to arrest him. We conclude that defendant was arrested without probable cause. We vacate his convictions and remand this cause for a hearing on whether defendant's statement was sufficiently attenuated from his illegal arrest to be admissible.

The record shows defendant was arrested on the night of December 9, 2000, in Oak

Lawn. In the early morning hours of December 10, 2000, he made an inculpatory statement about the attempted armed robbery at the police station that was transcribed in longhand by Detective Charles Zylius and signed by defendant. At 6 p.m. on December 11, 2000, defendant gave an inculpatory statement about the armed robbery to Assistant State's Attorney Joel Buikema. Defendant was charged by indictment with two offenses committed on the night of December 9, 2000: the armed robbery of Alfonso Casarrubias (No. 01 CR 696) at 9:49 p.m. in Evergreen Park and the attempted armed robbery of Beverly Hajek (No. 01 CR 707) at 10:40 p.m. in Oak Lawn. Defendant's accomplice, Jeffrey Sampson, also was charged with the offenses. Sampson was arrested soon after defendant, but Sampson gave an inculpatory statement to the police before defendant gave his statement.

Before defendant's trial, defense counsel filed a motion to quash defendant's warrantless arrest as lacking in probable cause and to suppress his statement. At a hearing on the motion, the following testimony was presented.

Scott O'Neill, an Oak Lawn patrolman, testified that around 10:42 p.m. on December 9, 2000, he was in uniform in a marked police car when he was dispatched to an armed robbery in progress near 53rd Court and 89th Street. The dispatch described the suspects as "two black males in their 20s" who were armed and headed eastbound on foot. There was no physical description of the men or their clothing. O'Neill said he drove toward the location given. When he turned his car from 91st Street onto 53rd Court, he saw one car in the area. The car's headlights were on and it was stopped about two blocks away from O'Neill on Kimball Avenue at 53rd Court. That was the same block where the reported robbery occurred. O'Neill drove

2

toward Kimball Avenue and stopped at the intersection. He remained stopped for about 20 seconds. The car under observation did not move. O'Neill said he could see a person in the car but he could not tell whether the person was male or female. As O'Neill began to turn right onto Kimball Avenue, the observed car began to turn left onto 53rd Court. O'Neill said he was then about 10 feet away from the car at a lighted intersection in a lighted residential neighborhood. O'Neill looked inside the car and made eye contact with the driver, whom he identified as defendant. O'Neill said when he made eye contact, the driver shifted in his seat from a forward position to a leaning-back position with his arm extended. O'Neill testified that the driver was a black male in his early 20s. O'Neill also testified that the population of the neighborhood was predominantly white.

O'Neill testified he called for backup, pulled defendant's car over and approached the driver's side with his gun drawn. He asked the driver to get out of the car. When defendant exited the car, O'Neill noticed snow on his pants from mid-calf down. There were snow drifts on the ground that night. O'Neill testified that when he performed a pat-down search of defendant, he noticed defendant was breathing heavily and his heart was beating rapidly. O'Neill told another officer to handcuff defendant. O'Neill testified that defendant was not free to go after he was handcuffed. O'Neill estimated that the elapsed time between the dispatch and his arrival at 53rd and Kimball was, at most, two minutes.

Defendant testified that on the night of December 9, 2000, he was driving through Oak Lawn on his way home from a movie when he saw about seven police cars at an intersection. As he passed through the intersection, he gave the officers the right of way because of the flashing

3

lights on their cars. Defendant was stopped by the police, and an officer pulled him from his car. The officer asked defendant incomprehensible questions, threw defendant to the ground and kicked defendant with his boots. Defendant said he was breathing heavily and had a rapid heartbeat because he was "scared for [his] life." Defendant said the officers pointed their pistols at him, blocked him in and told him if he did not put his hands up, they would shoot him. Defendant said he probably had snow on his shoes but not on his pants. Defendant said after his arrest, he gave a statement while behind closed doors in an interrogation room with three officers, including the one who kicked him.

The trial court denied defendant's motion to quash his arrest and suppress his statement in a written ruling, finding:

"that Officer O'Neill possessed knowledge of sufficient articulable facts at the time of the stop *** to create a reasonable suspicion that the [d]efendant had committed a crime. Further, that once the [d]efendant exited his car[,] Officer O'Neill became aware of additional facts that together with the facts he already possessed were sufficient to warrant a man of reasonable caution to believe that a crime had been committed and that the [d]efendant committed that crime."

Defendant later filed another motion to suppress the statement he gave during his interrogation. At a hearing on the motion, O'Neill testified that defendant, when apprehended, struggled, yelled and swore at the police. O'Neill said that in the struggle to handcuff defendant, O'Neill, defendant and another officer fell to the ground. O'Neill said he transported defendant in a squad car to the Oak Lawn police station.

4

Sergeant Quigley testified that there was a struggle during defendant's arrest in which defendant and Officers O'Neill and Joe Garrett fell to the ground. Quigley next saw defendant at about midnight in an interview room at the police station. Quigley said he did not see any injury to defendant or hear defendant complain of being injured. Quigley said he did not know if defendant remained in the interview room or was taken to the holding cell. At about 2 a.m. on December 10, 2000, Quigley and two other officers were in an interview room with defendant. Quigley said one of the officers informed defendant of his rights under Miranda. Defendant said he understood his rights and he signed a form to that effect. During questioning, defendant gave a statement that was handwritten by Detective Charles Zylius. The statement implicated defendant in the attempted armed robbery of Hajek. Quigley said he was out of the interview room long enough to have defendant's statement typed. Quigley signed defendant's completed statement at about 4:50 a.m. Quigley denied that defendant was questioned continuously from 12:00 a.m. to 4:50 a.m. Quigley said procedures other than questioning took place during that time. Quigley said defendant never asked to leave or complained of being injured or struck, nor did he ask for medical attention, food, a telephone or a restroom.

Detective Zylius testified that he saw defendant at about 11:30 p.m. after defendant's arrest. He read defendant his rights under Miranda from a preprinted form. Defendant acknowledged that he understood his rights. Zylius said he was with defendant for 5 to 10 minutes. Zylius then left and defendant went either to his cell or to a location for processing. Zylius said he was not certain if he had a conversation with defendant between midnight and 4 a.m. but, during that period, defendant went from the interview room to a cell and back to the

interview room. Zylius said he did not know if defendant ate, slept or used the restroom or telephone. Zylius next saw defendant between 4 and 5 a.m. when he again advised defendant of his rights under Miranda and transcribed his statement. Defendant signed the statement in Zylius' presence at about 4:50 a.m. Zylius said he saw no injuries to defendant and defendant made no complaints. Zylius said he did not strike or see another officer strike defendant.

Detective Christine Maguire testified that she arrived at the scene of defendant's arrest as O'Neill was approaching defendant's car. She said she drew her weapon and asked defendant to get out of the car. She put her weapon away when O'Neill patted down defendant and another officer arrived. When O'Neill tried to put handcuffs on defendant, defendant started yelling and pulling away. This caused defendant and the officers trying to handcuff him to fall to the ground. Within 10 seconds, the officers brought defendant back up and told him to "just relax. We will explain everything to you *** we got to make sure we're safe first, then we will explain to you why we stopped you." Maguire admitted defendant fell face forward on the icy snow. She denied that she or another officer kicked or struck defendant. Maguire said she was at the police station between 4 and 5 a.m. for part of the interview with defendant. Zylius and Quigley were in the interview room with defendant when she arrived, but she did not know how long they had been there before she arrived or after she left. Maguire said she did not see that defendant had physical injuries and he appeared to be relaxed and was smoking a cigarette.

Defendant testified to essentially the same events as he had at the earlier hearing. He said even though he was handcuffed and cooperative, O'Neill kicked him in the ribs four or five times, causing a bruise and swelling . Defendant said when he was thrown to the ground, he

struck his chin or cheek but it did not leave a mark. Defendant testified that while he was seated in a chair near the wall in an interview room at the police station, O'Neill pushed defendant's head against the wall and told him to stop lying. Defendant said he was told to sign documents but he was not allowed to read them. He was told the documents were paperwork for getting bond. He said he signed the documents only because he was afraid. Defendant said he was never told of his rights under Miranda during his interrogation. He denied giving a statement to Zylius and he said he signed only what he was told to sign.

The trial court denied defendant's motion to suppress his statements, finding there was no physical or mental coercion that resulted in defendant giving the statement.

Before defendant's trial, the State moved to consolidate the two charges against him: No. 01 CR 696, the armed robbery of Casarrubias; and No. 01 CR 707, the attempted armed robbery of Hajek. Defendant objected on the grounds that the joinder of the charged offenses would result in prejudice. He argued, "[t]he charged offenses are not related, nor are they proved by evidence common to both cases. The only features the charged offenses share are that [(1)] they both occurred on the evening of December 9, 2000[,] in southwest Chicago suburbs; and [(2)] they both involve black males using a gun to demand money." The court granted the State's motion and consolidated the cases.

The cases proceeded to a jury trial. Casarrubias testified that on the night of December 9, 2000, he was robbed of cash and his watch. Casarrubias selected defendant and his accomplice in a lineup conducted on December 12, 2000, and he identified defendant in court. Casarrubias also identified a watch entered into evidence as his watch taken in the robbery. He testified that

7

one of the robbers wore a maroon jacket with a blue hood and the other wore a black jacket with yellow stripes.

Hajek testified that she was confronted by two men on December 9, 2000, one of whom was wearing a blue and white jacket. She was walking with her two children and her dog in her neighborhood, which is predominantly white. The men who confronted her were black. She testified that she was so terrified that she urinated on herself. When she told the men she had no money, defendant told her she could run away. She and her children and dog did so. She stopped a driver in a passing car. The driver had a cell phone and called the police. Hajek saw a man get into a car and pull away. A police car arrived while she was still on the phone with 911. Officer Quigley drove her children home while she and the dog walked back to her house. Quigley then drove her to the location where O'Neill had pulled over defendant's car. Hajek said she identified defendant as one of the robbers. Hajek admitted that the blue and white jacket she saw might have been brown and white. She described the other robber's clothing only as dark. She said she could not recall if the men wore hats, gloves, shoes or boots.

O'Neill testified to the same essential facts as at the earlier hearings.

Quigley's testimony included reading defendant's statement about his attempted robbery of Hajek to the jury over defense counsel's objection. Quigley read that defendant and his friend Sampson were driving in Oak Lawn at the time in question. Defendant was short of money. Defendant and Sampson saw a woman with her children and a dog and decided to take any cash the woman had. Defendant said that Sampson told him that he, Sampson, wanted to do it. Defendant parked the car at a corner. Sampson exited the car and got a gun from the trunk.

8

Defendant said it was a small caliber revolver. Defendant said in his statement, "I do not know where the gun was before I got it, but I do not take any responsibility for those previous actions." The statement went on to say that defendant and Sampson then attempted to rob the woman, Hajek, at gunpoint. The woman then ran away and defendant told Sampson he would get the car and pick him up. By the time defendant returned in the car, Sampson was gone. Defendant then pulled the car around the corner and the police stopped him. The statement said defendant was treated fairly by the police, offered food and drink and allowed to use the bathroom.

Quigley testified that Sampson also was apprehended that night. Quigley said he spoke to Sampson for about 1 1/2 hours. Quigley testified that Sampson told him the gun used in the robbery may have been in a coat Sampson received from defendant. Defense counsel did not object to Quigley's reference to Sampson's implication of defendant. Quigley testified that Sampson gave a statement that was memorialized in writing. Quigley said that after speaking to Sampson, he went in to talk with defendant. On cross-examination, defense counsel asked Quigley if he had received a statement similar to defendant's from Sampson. Quigley answered "yes."

Assistant State's Attorney Joel Buikema testified that he first met with defendant on the night of December 11, 2000, and advised him of his rights under Miranda. Buikema then took a statement from defendant, inculpating him in the armed robbery of Casarrubias. Buikema said after the statement was reduced to writing, defendant asked him to include in the statement that the police were "rough" with him, and Buikema did so. Buikema read the statement to the jury.

On cross-examination, defense counsel began questioning Buikema about the statement

9

he took from Sampson. The trial judge called a side bar, explaining that he had interrupted defense counsel's cross-examination of Buikema out of concern about defense counsel's continuing reference to Sampson's statement which implicated defendant. Defense counsel responded to the trial judge's concerns about the jury hearing that Sampson had identified defendant as being one of the perpetrators, saying "[t]hose concerns are, in fact, weighing rather heavily on me." In a discussion about the tactical implications of eliciting Buikema's testimony about Sampson's statement, the trial judge said:

"THE COURT: ***

So far the overwhelming evidence regarding Sampson's statements has been elicited by you. And particularly since the State's case is based in part on the theory of accountability, I don't see where you are. The rewards are outweighing the damage that could possibly be done. But if you make a conscious decision that that is your trial tactic *** I don't feel I should stop you from doing that.

MR. BROWN (Defense Counsel): You are letting me know that I proceed at significant peril?

THE COURT: Well, I think so, but it's not for me to decide what you should do."

Defense counsel said he was using the line of questioning to impeach Sampson's statement, but decided to withdraw it after the discussions in the side bar. The parties agreed that the trial judge would give a limiting instruction, directing the jury to disregard the statements of other persons

on defendant's guilt.

Defendant called four witnesses, including his cousin Leon Hopkins, who testified he was at the movies with defendant on the night in question.

Defendant contended in his closing argument that the witnesses' identification of him was unreliable, given their vague descriptions of the perpetrators after the robbery and the conditions under which the witnesses saw both the robbers and defendant. The prosecutor opened the rebuttal portion of his closing argument by saying, "the one thing that did not come out in [defense] counsel's argument was the word conspiracy, because basically that's what he is saying happened here." The prosecutor also made other comments that characterized defense counsel's argument as a claim that the State's witnesses engaged in a "grand conspiracy" against defendant.

The trial court's instructions to the jury included "[a] statement made by one defendant may not be considered by you against any other defendant."

The jury found defendant guilty of armed robbery and attempted armed robbery. Defendant filed a motion for a new trial, claiming the trial court erred in: (1) admitting a gun and photographs into evidence; and (2) denying his motion to quash arrest and suppress evidence. The trial court denied the motion.

At defendant's sentencing hearing, the court heard the testimony of defendant's mother, father and fiancée. Defendant also addressed the court. In imposing two concurrent sentences of 12 years each, the judge said he had considered the evidence at trial, defendant's presentencing report, the financial impact of his incarceration, evidence in aggravation and mitigation, arguments on sentencing alternatives and defendant's statement in his own behalf. The evidence

included: the fact that defendant had no criminal background; he supported his fiancée, who was pregnant, and their child; and he was active in his church. The State argued for a 10-year sentence, stressing that defendant had taken advantage of, and badly frightened, a woman with her children. The judge sentenced him to two concurrent 12-year terms of imprisonment.

Defendant appealed. After oral arguments before this court, the State sought leave to cite additional authority which we granted.

Defendant's main claim on appeal is that the trial court erred in denying his motion to suppress his inculpatory statements. He claims the police lacked reasonable suspicion to stop him and probable cause to arrest him. As a result of these illegal seizures, he contends that his inculpatory statements should have been suppressed as "fruit of the poisonous tree" under Wong Sun v. United States, 371 U.S. 471, 485-86, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416 (1963) (verbal evidence that derives immediately from an unauthorized arrest is the " 'fruit' of [an] official illegality").

In reviewing a circuit court's ruling on a motion to suppress, we will uphold the court's findings of fact unless its findings are against the manifest weight of the evidence. People v. Pitman, 211 Ill. 2d 502, 512, 813 N.E.2d 93 2004 . We apply *de novo* review to the question of whether the evidence should have been suppressed. Pitman, 211 Ill. 2d at 512.

We first address O'Neill's stop of defendant. Defendant argues that O'Neill lacked a reasonable suspicion to stop him after the dispatch described *two* black males in their 20s who were fleeing *on foot*, not one person in a car who was not fleeing. The State argues that defendant's close proximity to the scene within a few minutes of the robbery, his suspicious

1-04-1317

behavior in stopping the car and leaning backward in his seat, and the fact that he was a black male in his 20s were sufficient articulable facts at the time of the stop to create a reasonable suspicion that defendant had committed a crime.

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880 1968 . See also section 107-14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-14 (West 2004) (the Illinois codification of Terry)). These laws empower a police officer to briefly stop a person for temporary questioning if the officer has knowledge of sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed or is about to commit a crime." People v. Lee, 214 Ill. 2d 476, 487, 828 N.E.2d 237 2005 . A stop must be objectively reasonable and predicated on specific and articulable facts that, taken together with the resulting inferences, would warrant the intrusion. People v. Mata, 178 Ill. App. 3d 155, 159-60, 533 N.E.2d 370 (1988).

Here, the specific and articulable facts were that a crime had been committed by two black males in their 20s in the same block where O'Neill saw defendant in a car. The crime had taken place mere minutes before O'Neill saw defendant, who was a black male in his 20s. Although the descriptions of the perpetrators lacked detail, we cannot say that it was objectively unreasonable for O'Neill to initiate a stop for investigation purposes. The facts known to O'Neill could support, albeit thinly, a reasonable suspicion that defendant had committed a crime.

13

*But we do not believe that the officers' actions fare as well when tested through the filter of probable cause.* *An arrest without either a warrant or probable cause violates a person's constitutional right to be free from unlawful searches and seizures.* People v. Ollie, 333 Ill. App. 3d 971, 980, 777 N.e.2d 529 (2002), *citing* People v. Melock, 149 Ill. 2d 423, 436, 599 N.e.2d 941 (1992) (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6). *Probable cause exists where, at the time of the arrest, the facts and circumstances known to the police officer would lead a reasonable person to believe that the defendant had committed a crime.* Ollie, 333 Ill. App. 3d at 980. An arrest is improper if a police officer arrests a suspect without questioning the person or in some other way investigating *to raise his reasonable suspicion to the level of probable cause.* Lee, 214 Ill. 2d at 488. *Even if the totality of the circumstances known to the officer are enough to heighten his suspicion and justify further investigation, the officer still may not have enough information to support a warrantless arrest.* Lee, 214 Ill. 2d at 488.

An arrest has taken place when the suspect's freedom of movement is restrained by physical force or a show of authority. Ollie, 333 Ill. App. 3d at 981. *The key inquiry is whether, under the circumstances, a reasonable innocent person would have concluded that he was not free to leave.* Ollie, 333 Ill. App. 3d at 981. *The answer may be influenced by factors, including* the number of officers present, their display of weapons, whether the officers touched the person, whether their language suggested a compulsion to obey, and whether common arrest practices, such as searching, handcuffing and fingerprinting, took place. Ollie, 333 Ill. App. 3d at 981.

Here, defendant was not questioned before he was handcuffed. Instead, O'Neill's suspicions were heightened when he patted down defendant, felt his racing heart and heavy

14

1-04-1317

breathing and saw snow on his pants. We believe that these findings warranted further investigation but did not provide O'Neill with enough information to support a warrantless arrest. We conclude that defendant was under arrest when O'Neill began handcuffing him, wrestled him to the ground with the help of another officer, secured the handcuffs and told defendant to relax and wait for an explanation of their actions. Defendant's freedom of movement was restrained by a show of physical force. At least two of the three officers present displayed their weapons. O'Neill and Garrett not only touched defendant but wrestled him to the ground to detain him. Under these circumstances, a reasonable innocent person undoubtedly would have concluded he was not free to leave, but under arrest.

Our conclusion that defendant was subject to an illegal arrest does not prevent the legal admission of his confession. "*Evidence collected following an illegal arrest may be admissible if it is sufficiently attenuated from any illegality. People v. Klimawicze, 352 Ill. App. 3d 13, 19, 815 N.E.2d 760 2004 . To decide whether the confession was attenuated from the illegal arrest, we consider four factors* (1) whether Miranda *warnings were given* 2 *the amount of time between the defendant s arrest and his statement* 3 *whether there were intervening circumstances and* 4 *the degree of flagrancy of police misconduct. Klimawicze, 352 Ill. App. 3d at 19, citing Brown v. Illinois, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 1975 . Typically, intervening circumstances and flagrancy of police misconduct are the two key factors in determining whether police exploited the illegal arrest to obtain a confession.* [Citations.]" Klimawicze, 352 Ill. App. 3d at 19.

Here, three of the four attenuation factors can be addressed based on the evidence before

15

the trial court. The record shows that defendant testified that he did not receive <u>Miranda</u> warnings and that the police engaged in misconduct. The police officers gave testimony rebutting defendant's claims, including their statements that <u>Miranda</u> warnings were given repeatedly and that the police did not engage in misconduct. The trial court's conclusion that the officers' testimony was more credible than defendant's was not against the manifest weight of the evidence and will not be disturbed on review. The amount of time between defendant's arrest and his statement can be calculated at approximately six hours based on documents of record. The key information that is not available in the record is on question of whether there were intervening circumstances. See <u>Klimawicze</u>, 352 Ill. App. 3d at 19.

Intervening circumstances are those that break the causal connection between the taint of unconstitutional police conduct and the defendant's confession. <u>People v. Austin</u>, 293 Ill. App. 3d 784, 788, 688 N.E.2d 740 (1997). An intervening circumstance that may support the admission of an in-custody statement occurs when an arrestee is confronted with new information that is untainted by the illegal arrest. <u>Austin</u>, 293 Ill. App. 3d at 788. Here, the evidence showed that the police received new information on defendant's culpability from Sampson. But it is not clear whether defendant was directly confronted with the information obtained from Sampson. The State argues that is does not matter if defendant was confronted directly with Sampson's statement because the court in <u>People v. Wilberton</u>, 348 Ill. App. 3d 82, 85-90, 809 N.E.2d 475 (2004), did not specify that a confrontation was necessary to support a finding that an intervening circumstance occurred.

We are unwilling to join the State in this interpretation of <u>Wilberton</u> and to apply as rules

conclusions that have been suggested in other cases that involved attenuation and intervening circumstances. The Supreme Court has cautioned that the question of whether a defendant s statement was obtained by means sufficient to cleanse the taint of the illegal arrest depends on the facts of each case. Brown v. Illinois, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261 1975 . Here, we do not have enough information in the record to make an independent determination of whether the intervening circumstance of Sampson s confession, or other circumstances unknown to us, can purge the taint of defendant s illegal arrest.

Where the record does not allow this court to make an independent determination on attenuation, we will vacate the convictions and sentences and remand the cause to the trial court with directions to conduct a hearing on whether the inculpatory statement was sufficiently attenuated from the illegal arrest to render it admissible. Ollie, 333 Ill. App. 3d at 987. We do so now.

Because the trial court on remand may find enough attenuating circumstances to conclude that defendant's statement was admissible, we will address defendant's other claims on appeal. See Ollie, 333 Ill. App. 3d at 987 (where the trial court may find sufficient attenuating circumstances to render a defendant's inculpatory statement admissible, the appellate court will address the defendant's remaining contentions of error).

In his petition for rehearing, defendant argues that even if the trial court on remand finds that his confession was sufficiently attenuated from his illegal arrest, he still is entitled to a new trial because the trial court should have suppressed other evidence "poisoned" by the taint of the illegal arrest. See People v. Murray, 312 Ill. App. 3d 685, 690, 728 N.E.2d 512

1-04-1317

*2000* the fruit of the poisonous tree doctrine was established in *Wong Sun v. United States*, *371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 1963* . Defendant contends that Hajek's in- and out-of-court identifications of him and the State's evidence of clothing taken from him and his car were tainted by the illegal arrest and require a new trial.    An error, even one of constitutional proportions, can be considered harmless error if it was harmless beyond a reasonable doubt. *People v. Wilkerson, 87 Ill. 2d 151, 157, 429 N.E.2d 526 1981* . To determine whether an error was harmless beyond a reasonable doubt, courts: (1) focus on the error to decide whether it might have contributed to the conviction; (2) decide, based on the other evidence in the case, whether the overwhelming quantum of evidence supported the conviction  *3*  decide whether the evidence was cumulative or duplicative of properly admitted evidence. *Wilkerson, 87 Ill. 2d at 157.*

Here, we believe that defendant s confession to *Quigley* and *Zylius* on the attempted armed robbery of *Hajek* and his confession to *Buikema* on the armed robbery of *Casarrubias* constituted overwhelming evidence. If the confessions are found to be attenuated and admissible, then *Hajek* s identifications and the physical evidence of clothing were harmless beyond a reasonable doubt.

Defendant also claims he suffered ineffective assistance of counsel, was prejudiced by prosecutorial misconduct and received an excessive sentence.  The State contends that these claims were not raised in defendant's motion for a new trial and are waived on appellate review. See People v.  Enoch, 122 Ill. 2d 176, 186-88, 522 N.E.2d 1124 (1988) (to be preserved for review, a question must be raised both in a trial objection and in a posttrial motion).  Waiver aside, we conclude that these issues would not constitute reversible error if defendant's

18

convictions and sentences were reinstated after an attenuation hearing.

Defendant cites two instances of alleged error by counsel: (1) when defense counsel failed to object when the State elicited Quigley's testimony that the gun used in the robbery may have been inside a coat Sampson received from defendant; and (2) when defense counsel's questioning of Quigley and Buikema on cross-examination revealed that Sampson's statement implicated defendant. Defendant argues the testimony his attorney elicited on cross-examination about Sampson's confession was inadmissible, prejudicial and unjustifiable as trial strategy.

The State counters that defendant cannot show that, but for counsel's performance, the outcome of the trial would have been different, as is required under the second prong of the test for ineffective assistance of counsel established in Strickland v. Washington, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 1984 . The State also argues that potential errors were cured when the trial court instructed the jury to disregard references to another person's statement, citing People v. Mikell, 217 Ill. App. 3d 814, 830, 577 N.E.2d 1300 (1991) ("[i]t is presumed on appeal that the jury followed the trial court's instructions").

The state and federal constitutions guarantee the right to effective assistance of counsel. U.S. Const., amends. VI, XIV Ill. Const. 1970, art. I, §8. To succeed in a claim of ineffective assistance of counsel, the proponent must demonstrate 1 that counsel s performance fell below an objective standard of reasonableness and 2 counsel s performance prejudiced the defense of the case. Strickland, 466 U.S. at 687,  80 L. Ed. 2d at 693, 104 S. Ct. at 2064;  People v. Albanese, 104 Ill. 2d 504, 525, 473 N.E.2d 1246 (1984).   If it is easier to dispose of a claim based on the second prong of Strickland, lack of prejudice, then we need not consider whether counsel's performance fell

below an objective standard of reasonableness. People v. Burks, 343 Ill. App. 3d 765, 775, 799 N.E.2d 745 (2003). *To show that counsel s performance prejudiced the outcome of the case,* there must be a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland, *466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698*, 104 S. Ct. at 2068. The defendant must show that, because of counsel's deficient performance, the trial result was unreliable or the proceeding was fundamentally unfair. People v. Richardson, 189 Ill. 2d 401, 411, 727 N.E.2d 362 (2000).

Here, we have not lost confidence in the jury's verdict because defense counsel elicited testimony about Sampson's statements. There was ample evidence to support the jury's verdict of guilty even without counsel's questions about Sampson's statement. Both victims identified defendant soon after the crime and in open court. Both defendant's confession to Quigley about the Hajek incident and his confession to Buikema about the Casarrubias robbery were admitted and read to the jury. We do not believe that, but for defense counsel's cross-examination of Quigley and Buikema about Sampson's confession, the jury would have acquitted defendant of the charges against him.

Defendant complains in his petition for rehearing that this court misapplied the prejudice prong of the ineffective assistance of counsel analysis established in Strickland. He argues that this court applied an erroneous "outcome-determinative test" in requiring him to show that but for his attorney's mistakes, he would have been acquitted. Defendant argues that to prove

ineffective assistance, he need only show that counsel's performance " 'so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect,' " quoting Kimmelman v. Morrison, 477 U.S. 365, 374, 91 L. Ed. 2d 305, 318-19, 106 S. Ct. 2574, 2582 (1986).  He argues his attorney's actions, particularly in his cross-examination of witnesses about Sampson's statement, profoundly upset the balance of the adversarial process and compel a finding of ineffective assistance.

Our supreme court in Richardson, 189 Ill. 2d at 411, explained [t]he prejudice prong of Strickland entails more than an outcome-determinative test. The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. [Citations.]" Accord People v. Jackson, 205 Ill. 2d 247, 259, 793 N.E.2d 1 (2001).

Here, we first determined that defendant failed to show a fundamentally unfair proceeding or a reasonable probability that, but for defense counsel's unprofessional errors, the result of his trial would have been different.  We now add an explicit finding that defense counsel's performance did not so upset the adversarial balance between defense and prosecution that the trial was unfair and the verdict suspect.

Defendant next argues that the prosecutor engaged in misconduct when he told the jury in his rebuttal closing argument that the defense's position was that Casarrubias and Hajek engaged in a "conspiracy" with the police to frame defendant.  Defendant argues this was "a blatant misrepresentation" of his theory of defense and denied him a fair trial.  The State claims that the prosecutor's remarks were proper responses to defendant's arguments that the testimonies of the State's witnesses were incredible, mistaken or untrue.  It argues any error was cured by the trial

court's instructions to the jury.

A court will reverse a judgment because of improper closing arguments only if the defendant can identify remarks made by the prosecutor that were: (1) improper and (2) so prejudicial that justice was denied or the jury may have reached its verdict because of an error. People v. Evans, 209 Ill. 2d 194, 225, 808 N.E.2d 939 (2004). In general, a prosecutor has wide latitude in the content of his or her closing arguments. *Evans, 209 Ill. 2d at 225.* *Statements are to be considered in the context of the closing arguments as a whole. Evans, 209 Ill. 2d at 225. Where, as here, a prosecutor's comments in his rebuttal are at issue, the defendant cannot complain that the prosecutor's reply denied him a fair trial if defense counsel has provoked the response. Evans, 209 Ill. 2d at 225.*

Here, we disagree with the State's argument that defense counsel provoked the prosecutor's rebuttal. We do not see how defense counsel's closing remarks about the credibility of the State's witnesses permitted the prosecutor to reframe defendant's arguments as claims of a conspiracy among the State's witnesses. On the other hand, we cannot agree with defendant that justice was denied or that the verdict would have changed if the prosecution had not mischaracterized the defense's case as a conspiracy theory. There is no evidence that the jury reached its verdict based on this error.

Finally, defendant claims the trial court erred in sentencing him to two concurrent terms of 12 years. He contends the sentences were excessive given that no victims were physically harmed, defendant had no earlier convictions and his rehabilitative potential was excellent. The State argues that the sentences are appropriate and fall within the statutory range for each count.

A trial court is entitled to great deference in its sentencing decisions. *Klimawicze*, *352 Ill. App. 3d at 31.* The range of punishment for armed robbery, a Class X offense, is 6 to 30 years in prison. 720 ILCS 5/18-2(a) (West 2000); 730 ILCS 5/5-8-1(a)(3) (West 2000). The range of punishment for attempted armed robbery, a Class 1 felony, is 4 to 15 years. 720 ILCS 5/8-4(c)(2), 18-2(a) (West 2000); 730 ILCS 5/5-8-1(a)(4) (West 2000). *Where, as here, a sentence is within the statutory guidelines, it will not be disturbed on review unless it can be shown that the trial court abused its discretion.* Klimawicze, 352 Ill. App. 3d at 31. Factors for a trial court to consider in sentencing include: the nature of the crime, the defendant's role in committing the crime and the defendant's history and character, including his age, criminal record, family situation, employment and other related factors. Klimawicze, 352 Ill. App. 3d at 31. A defendant's potential for *rehabilitation is not entitled to greater weight than the seriousness of the offense, the protection of the public and the imposition of punishment.* *Klimawicze, 352 Ill. App. 3d at 31.*

Here, the record shows that the trial judge considered the appropriate factors in arriving at a sentence, including a presentence investigation report, a financial impact statement and evidence in aggravation and mitigation. Defendant's sentences were within the statutory range set by the legislature for his offenses. We cannot find fault with the trial court's decision to impose punishment near the maximum for defendant's attempted robbery conviction, given that the victim was a mother whose young children were present at the time of the attempt. Hajek's testimony of her terror underscored the seriousness of the offense. The trial court did not abuse its discretion in imposing two concurrent 12-year prison sentences.

We vacate the defendant's conviction and sentence and remand the cause to the circuit

court with directions to conduct an attenuation hearing. If the trial court finds that defendant's confession was sufficiently attenuated from his illegal arrest to render it admissible, the court is directed to reinstate defendant's convictions and sentences. *People v. Bramlett*, 341 Ill. App. 3d 638, 651, 793 N.E.2d 203 2003 . If, on the other hand, the trial court finds that attenuation does not exist to purge from defendant's confession the taint of his illegal arrest, then we direct it to suppress the confession and conduct further proceedings consistent with this opinion. *Bramlett*, 341 Ill. App. 3d at 651. A retrial would not be barred by the constitutional prohibition against double jeopardy because we find that the evidence presented at trial, including defendant's confession, was sufficient to support defendant's convictions beyond a reasonable doubt. See People v. Olivera, 164 Ill. 2d 382, 393, 647 N.E.2d 926 1995 .

Judgment vacated and cause remanded with directions.

BURKE and McBRIDE, JJ., concur.