(No. 56263.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CHARLES STANLEY JOHNSON, Appellee.

*Opinion filed February 4, 1983.*

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael A. Weinstein, Assistant Attorney General, of Chicago, and Michael E. Shabat, Michele A. Grimaldi, and Lester M. Joseph, Assistant State's Attorneys, of counsel), for the People.

Jerome Rotenberg, of Chicago, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the defendant, Charles Stanley Johnson, was convicted of murder and armed violence, and was sentenced to 20 years' imprisonment. The appellate court reversed, holding that the trial court erred in denying defendant's motion to quash his arrest and suppress evi-

dence. (103 Ill. App. 3d 734.) We allowed the State's petition for leave to appeal.

This appeal requires determination of only one question. Did the police have probable cause to arrest defendant?

The body of the victim, Albert Owens, was found on October 8, 1979, in the vicinity of the 7100 block of South Halsted Street in Chicago. He had been shot several times and died from multiple gunshot wounds inflicted by both a .38- and a .45-caliber revolver.

On Friday, October 12, 1979, at about 2:00-2:30 p.m., an informant told the police that the two individuals who had committed the murder resided at 6812 South Normal in Chicago. The informant gave a detailed description of one of the suspects, whom he indicated was known as "Stan," and also described the other suspect, whom he could not identify by name. He said Stan was approximately 5 feet 8 inches to 5 feet 10 inches tall, 25 to 30 years old, had a front tooth missing, a beard, and an "afro" hair style. The description of the other subject, while not appearing in this record, was apparently not as detailed as that given for Stan. The informant told police that Stan lived on the second floor of an apartment building and the other suspect lived in the basement apartment. Because the building was very large, the police brought the informant to the building and had him point out which apartments the suspects lived in.

The following morning, at approximately 7:30 a.m., six officers went to the Normal address. They did not have an arrest warrant. Upon arriving at the building, some of the officers were stationed at the front to insure that nobody entered or exited the building. The others went to the basement apartment, wherein one of the suspects allegedly resided, and knocked on the door. Two men answered and admitted the officers, while two other

men, one of them being Michael Head, climbed out a basement window and attempted to flee. One of the officers testified that Head was wanted for armed robbery. Head's physical description was similar to that of the unnamed suspect described by the informant. The other man fleeing with Head did not match "Stan's" description. Both men were apprehended by the officers who remained at the front of the building. The officers asked the other basement occupants whether they knew an individual named Stan, whom the officers described, and were told that Stan lived on the second floor.

Four officers went to the front door of the second-floor apartment and two others covered the rear exit. One of the officers knocked on the front door. Dorothy Rhines, who lived with defendant, asked who was there. The officer announced, "police officers," and told her to open the door.

From this point in time, the testimony is in conflict regarding the events which transpired. One officer testified that Rhines started screaming while unlocking the door. She opened it and ran into the hallway. At this point, the officer drew his gun. Rhines stopped, went back into the apartment, grabbed a baby, and ran into the hallway, leaving the door wide open. The officers looked in, saw defendant, who matched Stan's description, and asked him his name. Defendant replied, "Charles Johnson." The officer requested to see some identification and recalled that the defendant gave him a piece of identification with the name "Charles Stanley Johnson" on it. The officer then handcuffed defendant and placed him under arrest.

Rhines testified that after she opened the door she saw a police officer standing there pointing a gun at her. There were three other officers in the hallway, one of whom had a rifle. She started screaming and asked why they had guns drawn and if they had a search warrant.

One of the officers responded that the only warrant he needed was in his hand, indicating the gun, and all four officers entered the apartment. She did not consent to the police entry. In response to the commotion, defendant, who had been sitting on the couch in the front room, walked toward the front door. Upon seeing the defendant, the officers told him to stand still. They asked him his name and he told them. He was then handcuffed and seated on the front-room couch. Defendant was asked if anyone else was in the apartment, and he said his brother was in a bedroom sleeping. The brother was brought out of the bedroom, handcuffed and seated next to defendant.

One of the officers walked to the back of the apartment, opened the rear door and let in the other two officers. The police then ransacked the apartment. They opened a closet door, searched the closet and recovered an air rifle, a .22-caliber rifle and a .38-caliber revolver. Defendant admitted ownership of the rifles but denied ever having seen the revolver.

Investigator James Higgins testified that after he entered defendant's apartment, through the rear door, he walked down an inside hall, looked in an open closet, and saw the rifles and the revolver. The closet was about eight to 10 feet from the front door. He did not have a warrant and said he did not remember if the closet had a door. The officers also recovered a leather jacket in the living room of defendant's apartment. In the jacket pocket they found a .45 clip and ammunition. The clip and bullets were later admitted into evidence; however, the jacket was never inventoried, and defendant testified that the jacket, which he said was several sizes too large for him, was his brother's.

Shortly after his arrest, defendant was taken to police headquarters and was questioned about the Owens' shooting. He denied any knowledge of it. One of the offi-

cers testified that defendant was left basically alone in an interview room other than for routine questions until about noon time. During this interval, a ballistics examination was conducted which showed that two .38-caliber projectiles, one recovered from the victim's body and the other from the sidewalk near the scene of the crime, were fired from the .38-caliber revolver found in defendant's apartment. Investigator Higgins returned from the crime lab at 12 noon and related to defendant the findings of the ballistics examination. Defendant then gave various inculpatory statements.

Defendant testified he was physically and mentally abused at the police station and only admitted to the homicide to prevent further harassment. He denied making any oral admissions; rather, he said he was told the story by the officers.

The trial court found that the police went to the apartment with the intent to make an arrest, had probable cause to do so, and looked in defendant's closet as a reasonable precautionary measure.

The appellate court, in reversing defendant's conviction, held that the police did not have probable cause to arrest and that, consequently, the items seized in defendant's apartment should have been suppressed. Further, the court held that defendant's oral inculpatory statements should have been suppressed as a product of the illegal arrest.

The standards applicable to a police officer's probable cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied to a magistrate's assessment; less stringent standards would encourage police to avoid obtaining a warrant. (*Whiteley v. Warden* (1971), 401 U.S. 560, 566, 28 L. Ed. 2d 306, 312, 91 S. Ct. 1031, 1035-36.) The minimum standards under the Federal Constitution for the issuance of a warrant in cases where an informer's tip is

part of the basis for the magistrate's finding of probable cause have been set out in *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, and *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584.

*Aguilar* established a two-part test to determine if a warrant should issue. The affidavit supporting the warrant must inform the magistrate of (1) facts which establish that the informant is credible or his information reliable; and, (2) facts showing the underlying circumstances upon which the informant based his conclusion that the suspect engaged in criminal activity. In the instant case, no question is raised concerning the reliability of the informant. Rather, defendant contends the State failed to show any facts or circumstances establishing the basis of the informant's conclusion that he committed the homicide.

In *Aguilar,* a warrant was held insufficient where it was based on an affidavit which merely stated that the police had received reliable information from a credible person that narcotics were being kept on the defendant's premises. In addition to showing facts establishing the credibility of the informant, the court said that a finding of probable cause must be supported by the underlying circumstances· from which the informant concluded the narcotics were where they were supposed to be, rather than by mere affirmations of belief or suspicion. *Aguilar v. Texas* (1964), 378 U.S. 108, 114-115, 12 L. Ed. 2d 723, 728-29, 84 S. Ct. 1509, 1514.

The State conceded, during oral argument, that the police did not have probable cause to seek a warrant for defendant's arrest under *Aguilar* based on the informant's tip ·alone. Instead, it argues that any insufficiency in the tip was remedied by corroborative facts which developed during the police investigation at the apartment building. The State relies on *Spinelli,* where the court

announced that a tip, insufficient under the *Aguilar* tests but adequately corroborated by police investigation, may be considered as a basis for a finding of probable cause.

In *Spinelli,* the informer's tip—held inadequate under both *Aguilar* tests—indicated that the defendant had been operating a handbook and was accepting wagers and disseminating wager information over the telephone. The "corroborative" information relied upon to validate the inadequate tip was that: (1) the FBI had maintained surveillance of Spinelli's movements for five days, on four of which he had parked his car in a parking lot used by residents of a particular building and was once seen to enter a specific apartment therein; (2) an FBI check with the telephone company revealed that the apartment contained two phones with the exact numbers indicated in the tip; and (3) Spinelli was known to Federal and local law-enforcement agents as a bookmaker and a gambler.

While the court declared that sufficient detail may validate a tip, it held that this informant's tip, combined with the corroboration, was insufficient to provide a basis for a finding of probable cause. It said that the corroborative bits of information supplied by the FBI contained "no suggestion of criminal conduct when taken by themselves—and they are not endowed with an aura of suspicion by virtue of the informer's tip." (*Spinelli v. United States* (1969), 393 U.S. 410, 418, 21 L. Ed. 2d 637, 645, 89 S. Ct. 584, 590.) The court further indicated that where the tip does not detail how the information was gathered, it must describe the accused's criminal activity in sufficient detail to show that the tip is more than "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States* (1969), 393 U.S. 410, 416, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589.

As an example of sufficient corroboration of an informant's tip, the court in *Spinelli* tendered the facts in *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329. In *Draper,* a Federal narcotics agent was tipped by a reliable informer that the defendant recently had taken up abode at a stated address in Denver and was selling narcotics to several addicts in that city. Four days later, the informer told the agent that defendant had taken a train to Chicago on September 6 and would be returning by train from that city with three ounces of heroin on September 8 or 9. The informer gave the agent a detailed physical description of the defendant, including the clothing he would be wearing. He also told the agent the defendant would be carrying a "tan zipper bag" and habitually "walked real fast."

On the morning of September 9, at Denver Union Station, the agent saw a person (the defendant) precisely matching the description given by the informant alight from an incoming Chicago train. He was carrying a tan zipper bag and started to walk briskly toward the exit. The agent immediately arrested and searched him. Two envelopes of heroin and a syringe were found. The court upheld this arrest and the subsequent search, saying that after the agent personally verified all but one facet of the informer's tip, he had reasonable grounds to believe that the only remaining unverified fact—that the defendant would have the heroin on his person—was likewise true.

In applying these standards to the instant case, we must look at the information the police had and determine if the events which occurred at the apartment building sufficiently corroborated the tip to provide probable cause for defendant's arrest. The police knew that a murder had occurred at a particular location. Four days later, a reliable informant told them two men had com-

mitted the crime, described these individuals and showed the police where they lived. Seventeen hours later, six police officers went to the building where the alleged suspects lived, surrounded it and knocked on one of the suspects' apartment door. The State concedes, up to this point, that the police did not have probable cause to arrest. The informant's tip did not contain any facts from which it could be concluded that defendant was responsible for the murder. The tip was a mere affirmation of suspicion inadequate under the *Aguilar* "basis of knowledge" test.

The State argues that the flight by Head is sufficient corroboration of the informant's tip to provide, by inference, probable cause for an arrest of defendant. *McCray v. Illinois* (1967), 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056; *People v. Holdman* (1978), 73 Ill. 2d 213, *cert. denied* (1979), 440 U.S. 938, 59 L. Ed. 2d 496, 99 S. Ct. 1285.

In *McCray,* a reliable informant told police he had personally seen the defendant sell narcotics to various addicts at a specified location, and that the defendant presently had narcotics on his person and could be found at that location. When the police arrived there, they spotted a man walking with a woman. The informant pointed him out as the offender. The officers observed him separate from the woman, meet briefly with another man and then proceed alone. Upon seeing the police car, defendant hurriedly walked between two buildings. The police arrested him, and a subsequent search revealed heroin. The court said the police had probable cause to arrest and search the defendant on the basis of *Draper* and *Aguilar,* because the officers' testimony revealed both the proved reliability of the informant's past information and the underlying circumstances corroborating the present tip—police observation of the defendant in the same vicinity as reported by the informant, com-

bined with the defendant's flight upon seeing police.

In *Holdman,* two police officers were interviewing a robbery victim. He told the officers he had been robbed by two men who fled in a Buick driven by a third man. During the interview, two other officers, not knowing about the robbery, were on routine patrol in a marked squad car and noticed a Buick Skylark which they believed was associated with a fugitive. They pulled alongside and shined their spotlight into the vehicle. The driver of the Buick accelerated rapidly, a high speed chase ensued, and the Buick crashed into a viaduct. After the collision, the driver and passengers fled on foot. After calling for assistance, the officer chased, apprehended and brought these three men back to the crash site. The two officers interviewing the robbery victim had responded to the call for assistance, pulled up at the scene, and told the robbery victim to remain in the squad car. Instead, the victim walked to the lighted squad car in which the three fleeing suspects were seated and voluntarily identified two of them as the men who had robbed him. This court said the police had probable cause to arrest the passengers who fled from the Buick, because their on-foot flight provided the articulable facts necessary to justify an investigatory stop under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. In addition, their attempt to elude the police was found to be in violation of the resistance statute prohibiting resisting or obstructing a police officer. See Ill. Rev. Stat. 1973, ch. 38, par. 31—1.

The State's reliance here on *McCray* and *Holdman* is misplaced. In both cases, the defendants themselves attempted to flee when confronted by police. In addition, the informant in *McCray* personally observed the defendant engage in selling narcotics, and his tip was corroborated by police observations of activity consistent with the suspected crime and by the defendant's flight.

*Holdman* did not involve information from an informant, and its facts are too remote from the case at bar. The other cases cited by the State are simply distinguishable. *People v. Clay* (1973), 55 Ill. 2d 501 (informant's tip corroborated by information supplied by other witnesses at the scene of the crime); *People v. Dillon* (1970), 44 Ill. 2d 482 (tip corroborated by police observations of activity consistent with the alleged crime); *People v. Ivory* (1967), 38 Ill. 2d 339 (same).

In the instant case, the police, when they knocked on the basement door, only had the conclusional remark of the informant that defendant committed the murder. At that point, they observed Michael Head attempt to flee and arrested him. Since Head was wanted for an armed robbery, his flight when confronted by police may have provided probable cause for his arrest (see *Sibron v. New York* (1968), 392 U.S. 40, 66-67, 20 L. Ed. 2d 917, 937, 88 S. Ct. 1889, 1904-05), but it does not corroborate the informant's tip that defendant committed murder. The corroborating information must support the informant's conclusion that the *arrestee* and no one else committed the crime. *Whiteley v. Warden* (1971), 401 U.S. 560, 566-67, 28 L. Ed. 2d 306, 312-13, 91 S. Ct. 1031, 1035-36.

At the time of the arrest, defendant was not engaged in criminal activity and he did not attempt to flee when police confronted him. He was in a second-floor apartment doing nothing unusual. Under these circumstances, the attempted flight by Michael Head, who was wanted for a separate crime, cannot be used to elevate the suspicions of the police to the level of probable cause for defendant's arrest. The tip was insufficient under both *Aguilar* and *Spinelli,* and the police acted without probable cause in arresting defendant. Since the police lacked probable cause to arrest, we need not consider the contention that defendant's warrantless arrest was im-

proper under *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.

Defendant was arrested, taken to the police station, and questioned intermittently until he made the oral inculpatory statements. No intervening circumstances between the arrest and the statements were shown which would serve to dissipate the taint of the illegal arrest; his inculpatory oral statements should have been suppressed. *Taylor v. Alabama* (1982), 457 U.S. 687, 73 L.Ed. 2d 314, 102 S. Ct. 2664; *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*