FIRST DIVISION
June 25, 2007

No.1-05-0668

THE PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff-Appellee,

        v.

ROMELLE JONES,

    Defendant-Appellant.

)  Appeal from
)  the Circuit Court
)  of Cook County
)
)  No. 02 CR 22565
)
)  Honorable
)  John J. Moran, Jr.,
)  Judge Presiding.

JUSTICE CAHILL delivered the opinion of the court:

Defendant Romelle Jones was convicted of first-degree murder and attempted first-degree murder (720 ILCS 5/9-1(a)(1) (West 2006)) after a jury trial. He was sentenced to 30 years in prison for first-degree murder and 10 consecutive years for attempted first-degree murder. The trial court added 20 years to defendant's sentence for discharging a firearm during the commission of the offense (730 ILCS 5/5-8-1(a)(1)(d)(ii) (2006)). Defendant appeals, claiming the trial court erred in: (1) denying his motion to quash his arrest and suppress his confession where the police lacked probable cause to arrest him after smelling gunshot residue on his person; (2) failing to require the State to give race-neutral reasons for striking a prospective juror in violation of Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); and (3) admitting a forensic scientist's opinion on the results of a gunshot residue test when the scientist

was not present at the trial. We affirm.

Defendant was convicted of the murder of Tyrone Perkins and the attempted murder of Roscoe Robertson. The incident occurred at about 10 p.m. on August 1, 2002. Perkins died of a gunshot wound to his head. Robertson suffered a graze wound to his arm. Both Perkins and Robertson were members of the Gangster Disciples street gang. Defendant admitted he was a member of the Black Disciples street gang.

Before trial, defendant filed motions to quash his arrest and suppress evidence, including the results of a lineup and his videotaped confession. Defendant argued that the police lacked probable cause to arrest him and the evidence was inadmissible as the fruit of an illegal arrest. The following evidence was presented at hearings on the motions.

Detective Anthony Powell testified that on August 1, 2002, he and his partner Janet Scanlon monitored a call on their police radio, reporting a shooting in the 5700 block of South Carpenter. They heard descriptions of the shooters, first over the radio and then from officers at the scene. The description was of two African-American males, one taller than the other, both dressed in dark clothing. Powell said when they arrived at 5757 South Carpenter, they found a young man with an apparent gunshot wound to his head. Powell said other police officers were at the scene when he arrived.

Detective Scanlon testified that she went to the scene after hearing a call over the police radio. When she arrived, she spoke with police officers and civilian witnesses. Scanlon said she talked to Robertson, who described the offenders as two black males, both wearing dark clothing. She said Robertson told her one man might be wearing a purple T-shirt and one man was shorter

and had a lighter complexion than the other. Scanlon admitted on cross-examination that she interviewed Robertson at the Area One police station, not at the scene. On redirect examination, Scanlon said the descriptions given over the police radio were of two males in dark clothing, running south on Carpenter.

Officer James Shackleton testified that he and his partner, Officer Ryan Fields, were on patrol on the night of August 1, 2002. Between 10 and 10:10 p.m., they received a radio report of a shooting at 57th and Carpenter. The officers heard that two African-American males were the suspected shooters. Both officers knew of a "gang war" in the 5700 to 5900 blocks of Carpenter and that someone had been shot in the vicinity the day before. When Shackleton and Fields arrived at 6000 South Carpenter, other police officers were already on the scene. Shackleton said he arrested defendant within five minutes of seeing him. He said defendant was wearing black shorts and black gym shoes but no shirt. Shackleton admitted that, in a supplementary report written about three weeks after the incident, he had stated that defendant was wearing black pants and a white shirt. Shackleton testified that he heard several descriptions of the shooter on the police radio, including "male black, black shorts, black shirt, male black, black pants, black shirt, dark clothing." Shackleton said he heard that the shooters' direction of flight was southbound. He said he had a conversation "for a few seconds" with people who were at 57th and Carpenter. Shackleton said he received descriptions over the police radio and from people at the scene.

On cross-examination, Shackleton said he arrived within minutes of the call on the radio and found numerous people gathered around the victim. He said his priority when he arrived was

to look for the shooters because they had left the area just minutes before his arrival. He said the descriptions he received from the witnesses, who chose to remain anonymous, were of two African-American males wearing all black clothing who had run southbound on Carpenter. Shackleton testified that he was aware of a gang war between the Black Disciples and the Gangster Disciples, and that a person known as "Butter" had been shot in that area the day before. He said there was a makeshift "grave" or memorial dedicated to Butter, a member of the Black Disciples. He said several people were gathered around the "grave" when he arrived and one was defendant. Shackleton said that when he first saw defendant, defendant was running, appeared to be sweating profusely and was breathing heavily. Shackleton admitted it was a hot night. Shackleton said he and his partner approached defendant to question him. He said the information in the supplementary police report that defendant was wearing a white shirt was incorrect.

Shackleton testified that when he first approached defendant, he noticed an odor that he believed to be gunshot residue. Shackleton testified that he attended the police academy, had been in the presence of people who had recently fired a gun and had himself fired a gun after which he noticed the odor of gunshot residue on his person. He said he believed the odor emanating from defendant to be gunshot residue based on his experience and knowledge. He said defendant matched the description of the offenders: "A few individuals told us that they both had low haircuts, no facial hair or very little, and black shorts, black shoes and they fled southbound running on foot." He said he and his partner handcuffed defendant to immobilize his hands so he would not wipe off the residue.

4

On redirect examination Shackleton testified that he stopped defendant about 15 minutes after the shooting about three blocks from the scene. He admitted he did not mention gunshot residue in his supplementary report but instead referred to a "suspicious smelling residue on [defendant's] hands."

Shackleton testified that when he first saw defendant, defendant was running. Defendant then stopped at the memorial. The officers then "activated the vehicle" and told defendant to come over to talk to them. Shackleton said "[t]hen [defendant] was sweating profusely." He said defendant came over to where the police were standing.

The trial court denied defendant's motion to quash his arrest. The judge stated that he considered the totality of the facts and evidence and found the State's witnesses to be "credible and straightforward." He found that the information possessed by the police at the time defendant was spotted was legally sufficient to justify a Terry stop. See Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The judge said, "When [the officers] got within close proximity of the defendant, based on this officer's familiarity with the odor of gunshot residue, that in his judgment he smelled on that person of [defendant]."

The court then heard defendant's motion to suppress the lineup evidence. Scanlon testified that defendant appeared in a five-man lineup viewed by Robertson. She said Robertson identified defendant "immediately." The trial court found that the lineup was not constitutionally impermissible.

The trial court held a separate hearing on defendant's motion to suppress his statement. In addition to reiterating some of his earlier testimony, Powell testified that he spoke with

5

defendant in an interview room at Area One at about 1:10 a.m. on August 2, 2002. Powell said he advised defendant of his rights under Miranda. Powell said he then had a 10-minute conversation with defendant about procedures. Defendant was still shirtless. Powell said he returned to the interview room at 1 p.m. in the afternoon of August 2, 2002. He said defendant asked for a shirt and Powell obtained one for him at a thrift store. Powell said he provided defendant with food. Powell and Scanlon spoke to defendant at about 10 p.m. that evening. They advised him of his rights and defendant said he understood. They told defendant that he had been identified in the lineup. Defendant then made an admission that lasted about 45 minutes. At 12:45 a.m. on August 3, 2002, an assistant State's Attorney arrived and spoke with defendant. Defendant was again advised of his rights under Miranda. He made a 40- to 45-minute statement to the assistant State's Attorney. Powell said defendant did not ask to speak to a lawyer. Powell denied that he struck defendant or knew that others struck defendant or heard that defendant claimed to have been beaten or threatened.

Detective Scanlon testified to the same essential facts as Powell. She said she was present when defendant chose to give a videotaped statement and when he signed a consent to videotape his statement.

The trial judge denied defendant's motion to suppress his statement, finding the officers' testimony to be credible. The judge found defendant's demeanor in the videotaped statement to be "inconsistent with a coerced statement."

On January 25, 2005, jury selection began for defendant's trial. Rose Taylor, an African-American, was questioned by the court as a prospective juror. Taylor testified that she had

6

worked for 20 years as a records clerk at a law firm engaged in civil work. She said her husband was a retired minister. She said her adult daughter was a housewife. She testified that in her free time, she liked to read spiritual books and literature. She said she was not knowledgeable about handguns and had no opinions about them that would prevent her from being fair. She said evidence that defendant was a gang member would not prevent her from being fair. She said if defendant decided not to testify she would not hold it against him. She said she could objectively evaluate the testimony of police officers and could be fair to both sides.

In the first round of peremptory challenges, the prosecutors excused two of four venirepersons, including Taylor. Defendant did not object. Defendant then provided three more venirepersons of whom two African-Americans, Vernon Dandridge and Darryl Vurrell, were struck by peremptory challenges of the State. Defendant made a Batson challenge after these strikes, contending there was "no reason" to have excluded the three African-American jurors, including Taylor. The trial court denied that challenge, finding no pattern of discrimination. Defendant provided four more venirepersons. The prosecutor struck an African-American, Randall Douge. Defendant renewed his Batson challenge. The trial court found a *prima facie* case of discrimination and directed the prosecutor to respond. The prosecutor offered race-neutral explanations for striking Douge, Vurrell and Dandridge. Neither the trial court nor defense counsel asked the State for a race-neutral reason for striking Taylor. Defendant did not object when no race-neutral reason was given for striking Taylor. The trial court denied defendant's Batson motion and jury selection continued without further challenges.

At trial, witnesses for the State were Detectives Powell and Scanlon, Officers Fields and

7

Glenn Walton and Assistant State's Attorney Kim Ward. Their testimony was consistent with the testimony given in the pretrial hearings. Robertson testified, admitting that he had been convicted of felonies related to narcotics and was a member of the Gangster Disciples.

Angela Horn, who was qualified as a forensic scientist, testified that her examination of the cartridge cases at the scene supported the conclusion that all of the cartridges were fired from two guns. Courtney Melendez, a forensic scientist in the area of latent fingerprints, testified that the cartridges found at the scene were not suitable for comparison with latent prints.

Scott Rochowicz, a forensic scientist and qualified expert witness, testified that he had reviewed the results of a gunshot residue test conducted by forensic scientist Mary Wong, who was on maternity leave. Rochowicz described Wong's procedures and opined that based on Wong's testing, defendant either had discharged a firearm, handled an item that was contaminated with gunshot residue or was in close proximity of a firearm when it was discharged.

Defendant called Bernard Franklin, who testified that he saw defendant in front of Franklin's house at 6008 South Carpenter Avenue about 15 to 30 seconds before the shooting. Franklin said he saw defendant walking back and forth between the memorial to Butter and the home of a girl at 59th and Carpenter. He said defendant was drinking and was not wearing a shirt. Franklin admitted that he could not see the girl's house from where he stood.

Defendant testified in his own defense. He said on the night of the shooting, he was in the vicinity of 60th and Carpenter. He said he made trips back and forth between the memorial and the home of his girlfriend, Renatta. He said he was in front of Renatta's house when he

heard gunshots. He said he did not know where the shots were being fired. Defendant denied having a gun with him that night or shooting anyone. He testified that he told the detectives what they wanted him to say. He said most of the information in his videotaped confession was what Powell told him to say. He said he never fired a gun that night.

The jury convicted defendant of first-degree murder and attempted first-degree murder and found that he had discharged a firearm in committing first-degree murder. The court sentenced defendant to 30 years in prison for first-degree murder and 10 years for attempted first-degree murder, to be served consecutively. The court added 20 years to his sentence for discharging a firearm during the commission of the offense. See 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2006).

On February 18, 2005, defendant presented a motion for a new trial, arguing, among other things, that the trial court erred in denying his motions to quash arrest and suppress evidence and in denying his Batson challenge. The trial court denied the motion for a new trial. On June 7, 2005, defendant filed this appeal.

Defendant first claims that the trial court erred by denying his motions to quash his arrest and suppress the evidence against him. He argues that his behavior at the time of his arrest was not suspicious. He claims that when the police stopped him, he was not hiding from the police but was approaching uniformed officers. He claims that because the police officers lacked probable cause to arrest him, the evidence they obtained after the arrest should be suppressed as the "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 484-85, 9 L. Ed. 2d 441, 453-54, 83 S. Ct. 407, 415-16 (1963).

The State contends that the arresting officers had reasonable suspicion to stop and probable cause to arrest defendant.

In reviewing a trial court's ruling on motions to quash arrest or suppress evidence, the appellate court defers to the court's factual findings unless they are against the manifest weight of the evidence. People v. Sorenson, 196 Ill. 2d 425, 430-31, 752 N.E.2d 1078 (2001). The deferential standard of review is appropriate because the circuit court is best able to determine issues of fact and credibility. Sorenson, 196 Ill. 2d at 430-31. Where a motion to quash arrest or suppress evidence turns on a legal question of reasonable suspicion or probable cause, we apply de novo review. Sorenson, 196 Ill. 2d at 431. Using these standards together, we give great deference to the circuit court's findings of fact, but we review the legal questions of probable cause and the suppression of evidence de novo. Sorenson, 196 Ill. 2d at 431.

Defendant claims he was improperly stopped and arrested by the police. The fourth amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const., amend. IV. When an officer observes "possibly criminal behavior," the officer may make an investigatory stop without probable cause and may make "reasonable inquiries" to confirm or dispel his suspicions. Terry v. Ohio, 392 U.S. 1, 22, 30, 20 L. Ed. 2d 889, 907, 911, 88 S. Ct. 1868, 1880, 1884 (1968). A police officer must have a reasonable and articulable suspicion to make an investigatory "Terry stop." People v. Ertl, 292 Ill. App. 3d 863, 868, 686 N.E.2d 738 (1997). Officers must "point to specific, articulable facts which, when taken together with natural inferences, make the [officers'] intrusion [on the defendant] reasonable." Ertl, 292 Ill. App. 3d at 868. Because police officers often have to make quick judgments, the reasonableness

10

of police officers' conduct must be "judged on the basis of their responsibility to prevent crime and catch criminals." People v. Stout, 106 Ill. 2d 77, 86-87, 477 N.E.2d 498 (1985). "Reasonableness is measured in objective terms by examining the totality of the circumstances." People v. Moss, 217 Ill. 2d 511, 518, 842 N.E.2d 699 (2005).

Here, the officers had a reasonable, articulable suspicion to justify a stop. After arriving at the scene of the shooting, the arresting officers spoke personally with several witnesses who described the suspects as African-American males with short haircuts, no or very little facial hair, wearing black clothing and running southbound from 57th and Carpenter. This was consistent with the descriptions officers heard over the police radio. The officers saw defendant, who matched the description given by the witnesses. He was running southbound a few blocks from the scene of the shooting, a few minutes after the crime occurred. The officers knew of a gang war in that immediate area. These circumstances when considered together gave the officers reasonable suspicion to justify stopping defendant.

Defendant argues that he should not have been stopped because the descriptions over the radio came from an unidentified source. It is well established that the reliability of an informant is only one factor among many in a totality-of-circumstances analysis. People v. Adams, 131 Ill. 2d 387, 397, 546 N.E.2d 561 (1989). Here, the apprehension of defendant was not based solely on the information reported over the police radio. Defendant matched the descriptions given to Shackleton by witnesses near the scene. The fact that the source of the call over the police radio was not disclosed does not preclude a finding that the police had proper grounds to stop defendant.

11

Defendant argues against this conclusion, characterizing the descriptions the officers received from anonymous witnesses as vague and uncorroborated. In general, the reliability of an ordinary citizen, unlike an informant, need not be established. People v. Williams, 305 Ill. App. 3d 517, 524, 712 N.E.2d 883 (1999). Absent indications to the contrary, information provided by an ordinary citizen is presumed to be reliable. Williams, 305 Ill. App. 3d at 524. Here, although the witnesses did not provide their names, the officers were able to observe them and assess their credibility. The witnesses' descriptions were sufficiently specific. Shackleton testified that the witnesses said the offenders had low haircuts, very little or no facial hair, black shorts, black shoes and were running southbound on foot. Defendant matched this general description.

Defendant next argues that the police lacked probable cause to make a warrantless arrest because the smell of gunshot residue did not prove he had fired a gun in the recent past. In general, a police officer cannot make a legal arrest without a warrant supported by probable cause. People v. Flowers, 179 Ill. 2d 257, 262, 688 N.E.2d 626 (1997). "Probable cause for arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense." People v. Lippert, 89 Ill. 2d 171, 178, 432 N.E.2d 605 (1982). Probable cause can be established where the police have more than a mere suspicion that the arrestee committed the crime in question but less than evidence sufficient to convict. Lippert, 89 Ill. 2d at 178. The difficulty of establishing probable cause is lessened when it is known that a crime has been committed. Lippert, 89 Ill. 2d at 179-80, citing 1 W. LaFave,

Search and Seizure §3.2, at 478-85 (1978). " '[T]the existence of known criminal activity serves to provide an anchor or touchstone, in a time-space sense, which limits the police arrest authority. Police will not continually be arresting upon a less than 50% probability of guilt, but only in limited situations where a person is found in an area where it is known a crime has recently occurred.' " Lippert, 89 Ill. 2d at 179, quoting 1 LaFave, Search and Seizure §3.2, at 484-85 (1978). The police need less of a factual basis to establish probable cause when they are acting in response to a recent murder or other serious crime than when it is not known if a crime has been committed. Lippert, 89 Ill. 2d at 180. In cases of serious crime, " 'experience has shown that the chances of apprehending the offender are slight unless he is caught in the vicinity of the crime.' " Lippert, 89 Ill. 2d at 180, quoting 1 LaFave, Search and Seizure §3.2, at 484-85 (1978).

Here, the serious crimes of murder and attempted murder had been committed about 15 minutes before the police apprehended defendant. Defendant was within three blocks of the crime scene and fit the general description of the fleeing suspects. These circumstances alone support a finding of probable cause. More facts would have been needed to establish probable cause if the suspect had been physically or temporally more distant from the scene or if the officers did not know for certain that a serious crime had been committed. Not only did the time and place of defendant's apprehension correspond to the time and place of the shooting, but defendant also fit the description given by the witnesses and had been running as reported by the witnesses.

The odor of gunshot residue was yet another fact in support of probable cause.

13

"[D]istinctive odors can be persuasive evidence of probable cause. A police officer's detection of controlled substances by their smell has been held to be a permissible method of establishing probable cause." Stout, 106 Ill. 2d at 87.

Here, the facts and circumstances known to Shackleton—physical description, proximity in time and place and gunshot residue odor—combined to permit a person of reasonable caution to believe there was probable cause.

Defendant relies on People v. Johnson, 94 Ill. 2d 148, 159, 445 N.E.2d 777 (1983), to argue that corroboration of a tipster's information "must support the *** conclusion that the arrestee and no one else committed the crime." (Emphasis omitted.) Johnson, 94 Ill. 2d at 159. There, an informant gave police a detailed description and the address of a murder suspect. The next day, the police went without a warrant to the address and knocked on the door of a second-floor apartment. Johnson, 94 Ill. 2d at 150. When a woman opened the door, the police discovered a man inside whose name and appearance matched the informant's tip. The police arrested the defendant. The supreme court determined that the arrest was illegal because it was based solely on the conclusory and uncorroborated remarks of an informant. Besides the questionable tip, the court took into consideration the facts that the defendant was not engaged in criminal activity, did not flee when confronted and was doing nothing unusual. Johnson, 94 Ill. 2d at 159.

Here, the police had two sources of information that corroborated each other. The information over the police radio and the statements from witnesses both described the shooters as two African-American men in dark clothing who fled southbound on Carpenter. Defendant

was running southbound on Carpenter and was seen at a location within a few blocks of the shooting within a few minutes of its occurrence. He was wearing black shorts and shoes. An odor emanated from him that an experienced police officer recognized as the smell of gunshot residue. These facts distinguish this case from Johnson and support the conclusion that the police had probable cause to arrest defendant.

Because we have determined that the police had probable cause, defendant's claims that his lineup identification, results of the gun residue report and videotaped confession were tainted by his illegal arrest fail. The trial court correctly denied defendant's motions to quash arrest and suppress evidence.

During the pendency of this appeal, defendant filed and this court granted a motion to cite as additional authority People v. Hopkins, 363 Ill. App. 3d 971, 845 N.E.2d 661 (2006). In Hopkins, this court determined that the police made a proper Terry stop but lacked probable cause to arrest the defendant. The police handcuffed the defendant after noticing in a patdown search that his heart was racing, he was breathing heavily and he had snow on his pants. Hopkins, 363 Ill. App. 3d at 982. Two of the three officers present were displaying their guns. Hopkins, 363 Ill. App. 3d at 983. The defendant was detained without being questioned, wrestled to the ground by the police, handcuffed and told to wait for the police to explain their actions. Hopkins, 363 Ill. App. 3d at 982.

Here, the arrest was based on more than the fact that defendant was sweating and breathless after running on a hot evening. The odor of gunshot residue, when considered with the other evidence known to the police at the time, supports a finding of probable cause. As we

15

have said, a distinctive odor may be persuasive evidence in support of probable cause. <u>Stout</u>, 106 Ill. 2d at 87.

Defendant's next claim is that the trial court erred in failing to require the State to give a race-neutral reason for using its peremptory challenge to strike an African-American venireperson, Rose Taylor, as a juror. The Supreme Court has determined that the prosecution may not use its peremptory challenges purposefully to exclude members of a certain race from a jury. <u>Batson</u>, 476 U.S. at 84, 90 L. Ed. 2d at 79, 106 S. Ct. at 1716. Defendant argues that after the prosecutor here explained the reasons for striking three African-American venirepersons, the trial court failed to demand and the State failed to provide an explanation for striking Taylor. Defendant also failed to object. Defendant contends that because the State failed to establish a race-neutral reason for striking Taylor and the court failed to make a ruling as to Taylor, he is entitled to a new trial or at least a limited proceeding for a <u>Batson</u> determination.

The Supreme Court in <u>Batson</u> established a three-step process for deciding whether discrimination occurred in a jury's selection: (1) the party who objected must establish a *prima facie* case of purposeful discrimination; (2) if a *prima facie* case is established, the other party must articulate a nondiscriminatory explanation for striking the potential juror; and (3) the trial court then must consider the explanations given and determine whether purposeful discrimination occurred. <u>People v. Rivera</u>, 221 Ill. 2d 481, 500, 852 N.E.2d 771 (2006), citing <u>Batson</u>, 476 U.S. at 97-98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24.

The review of a trial court's conclusions after it conducts the three-step <u>Batson</u> analysis is deferential and reversal is proper only if the decision was clearly erroneous. <u>Rivera</u>, 221 Ill. 2d at

502. This standard is used because "a trial court's *third-stage* finding on the ultimate issue of discrimination rests largely on credibility determinations." (Emphasis in original.) Rivera, 221 Ill. 2d at 502. Where, as here, a defendant's Batson objection reaches the second stage but the defendant fails to object when the State does not give a race-neutral reason for one of its peremptory strikes, the argument is forfeited. People v. Primm, 319 Ill. App. 3d 411, 423, 745 N.E.2d 13 (2000).

The facts in Primm are similar to those here. There, the defendant raised a Batson objection to three potential jurors who had been challenged by the State. Primm, 319 Ill. App. 3d at 421. The State explained two of its three challenges. The judge deemed the explanations race neutral. Primm, 319 Ill. App. 3d at 421. The State did not explain its reasons for excluding the third venireperson. "The record [did] not suggest that the State's failure was deliberate." Primm, 319 Ill. App. 3d at 421. It appeared that neither defense counsel nor the trial judge noticed the omission and the jury selection continued. Primm, 319 Ill. App. 3d at 421. On appeal, this court determined the party opposing the peremptory strike, not the court or the prosecutor, had the responsibility of "pursuing or renewing his original objection." Primm, 319 Ill. App. 3d at 423. Accord People v. Jackson, 357 Ill. App. 3d 313, 327, 828 N.E.2d 1222 (2005) (a defendant who raises multiple Batson challenges forfeits his claim if he does not object to the State's failure to articulate a race-neutral reason for challenging one particular venireperson). See also Purkett v. Elem, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771 (1995) ("the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the [peremptory] strike").

1-05-0668

Here, defendant did not pursue his objection to the State's peremptory strike of Taylor. He did not ask the State for a race-neutral explanation for its peremptory challenge of Taylor. Defendant has forfeited his right to raise his objection to the peremptory strike of Taylor on appeal.

Defendant argues that Primm and Jackson were wrongly decided. Alternatively, he argues that this court should remand the matter for a new Batson hearing rather than finding his claim to be forfeited. He relies on cases where courts have found trial court error in resolving Batson objections, including People v. Garrett, 139 Ill. 2d 189, 194-95, 564 N.E.2d 784 (1990) (the appellate court should have made a limited remand for the purpose of a Batson hearing where it found merit to the defendant's claim that the trial court did not follow Batson); People v. Martinez, 317 Ill. App. 3d 1040, 1044-45, 740 N.E.2d 1185 (2000) (remand for an expedited Batson hearing was necessary where the appellate court found that the trial court failed to conduct the proper analysis under Batson); People v. Nunn, 273 Ill. App. 3d 519, 521, 652 N.E.2d 1146 (1995) (remand for a Batson hearing was necessary where defense counsel repeatedly sought a mistrial on the grounds that the State used peremptory challenges to keep African-Americans off the jury and the trial court made clearly erroneous decisions and omissions in resolving the issue).

Here, defendant did not object to the State's failure to provide a race-neutral reason for its peremptory challenge to Taylor as did the defendant in Nunn. Nor have we determined that the trial court erred in applying the three-step Batson analysis as did the courts in Garrett, Martinez and Nunn. These cases are distinguishable and do not require us to remand this matter for a

18

<u>Batson</u> hearing.

Defendant also contends that in addition to vindicating his own rights, a <u>Batson</u> hearing is necessary to protect Taylor's right not to be excluded from the jury on the basis of race, citing <u>Powers v. Ohio</u>, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991). The Supreme Court in <u>Powers</u> determined that a defendant in a criminal trial has standing to challenge the State's use of peremptory challenges to exclude a prospective juror on account of his or her race. <u>Powers</u>, 499 U.S. at 402, 113 L. Ed. 2d at 419, 111 S. Ct. at 1366. The court held that a defendant could raise a claim on behalf of a third party by demonstrating that: (1) the defendant suffered a concrete injury; (2) the defendant had a close relation to the third party; and (3) some hindrance prevented the third party's ability to protect her own interests. <u>Powers</u>, 499 U.S. at 410-11, 113 L. Ed. 2d at 424-25, 111 S. Ct. at 1370-71. Here, defendant has alleged none of these circumstances. Remand for a <u>Batson</u> hearing is not warranted to vindicate Taylor's right to serve on a jury.

Defendant's third claim on appeal is that he should receive a new trial because the trial court erred in allowing forensic scientist Scott Rochowicz to testify to his opinions on the gunshot residue tests conducted by Wong, who was unavailable. Defendant contends that Wong's statements should not have been admitted because they were improper testimonial hearsay evidence under <u>Crawford v. Washington</u>, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). In <u>Crawford</u>, the Supreme Court determined that the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had an earlier opportunity for cross-examination. <u>Crawford</u>, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The State argues that this argument is waived because

defendant failed to preserve the issue for appellate review by objecting at trial and raising the matter in a posttrial motion. People v. Enoch, 122 Ill. 2d 176, 187, 522 N.E.2d 1124 (1988). We agree that the issue is waived.

Waiver aside, the trial court did not err in allowing Rochowicz's testimony. It is well established that an expert may testify about the findings and conclusions of a nontestifying expert that he used in forming his opinions. People v. Nieves, 193 Ill. 2d 513, 528, 739 N.E.2d 1277 (2000). Here, Rochowicz, a qualified expert, testified that he had reviewed the results of the gunshot residue test conducted by Wong. He described the procedures Wong used and stated that in his opinion defendant either had discharged a firearm, handled something contaminated with residue or been in close proximity to a firearm when it was discharged. Rochowicz was subject to cross-examination. The trial court did not violate Crawford in allowing Rochowicz's testimony.

Having concluded that the trial court did not err in denying defendant's motions to quash arrest and suppress evidence or in ruling on defendant's Batson challenge or in allowing Rochowicz to testify to the gunshot residue tests conducted by Wong, we affirm the judgment of the circuit court.

Affirmed.

McBRIDE, P.J., and R.E. GORDON, J., concur.